ORIGINAL

FILED
MAR - 9 2007
U.S. COURT OF FEDERAL CLAIMS

**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| GENERAL INJECTABLES & VACCINES, INC, Plaintiff, | |
| v. | Civil Action No. 07-156-C |
| THE UNITED STATES, Defendant. | |

**COMPLAINT**

General Injectables & Vaccines, Inc. ("GIV") submits this Complaint challenging the December 11, 2006 final decision of the Department of Defense ("DOD") contracting officer to assess excess reprocurement costs under Contract No. SP-0200-04D-0003, which involved a contract under which GIV was to deliver Fluvirin® flu vaccine manufactured by Chiron to DOD for the 2004/05 flu season. A copy of the agreement (hereinafter, the "Contract"), is attached hereto as Exhibit 1.

GIV was unable to deliver the Fluvirin® because of Chiron's well-publicized inability to obtain Food and Drug Administration ("FDA") clearance to bring the vaccine into this country. GIV's contract with DOD was terminated for cause in November 2004, which termination is the subject of a separate proceeding now before the United States Court of Appeals for the Federal Circuit.

This action is not brought to relitigate the termination for cause, but to contest DOD's more recent, separate December 2006 decision to assess reprocurement costs against GIV based on the incorrect assertion that DOD was forced to purchase MedImmune's FluMist® nasal spray

because of the unavailability of Chiron's injectible Fluvirin® vaccine. For the several reasons set forth below, there is no legitimate basis to assess such reprocurement costs (even were the termination for cause meritorious).

**Parties**

1. Plaintiff GIV is incorporated in the Commonwealth of Virginia and maintains its principal place of business there. GIV is a licensed wholesale distributor of pharmaceuticals and supplies, including Chiron's Fluvirin® flu vaccine, which Chiron manufactured in its Liverpool, England facility.

2. Defendant United States, through the Department of Defense's "Defense Supply Center Philadelphia" ("DSCP"), administers contracts for military supplies.

**Jurisdiction**

3. The Court has jurisdiction under 28 U.S.C. § 1491 and 41 U.S.C. § 609.

**Factual Background**

4. On January 14, 2004, DSCP issued Solicitation No. SP0200-04R-0005 requesting a bid from GIV to deliver injectable flu vaccine for the 2004/2005 flu season.

5. GIV responded to the Solicitation on February 13, 2004, proposing to supply Chiron's injectable flu vaccine, Fluvirin®. GIV noted in its response that it was not Fluvirin's manufacturer but, rather, was its licensed wholesale distributor.

6. GIV has never owned or controlled Chiron or its manufacturing facilities, which were in Liverpool, England.

7. On April 21, 2004, DSCP awarded GIV the contract to deliver Fluvirin®.

8. On the same day as the contract award – April 21, 2004 – DSCP issued Delivery Order No. SP0200-04D-003-8001, requesting delivery of 226,846 Vials of Fluvirin®, which is 2,268,460 doses, and 17,460 Packages of Pre-filled Syringe Units, which is 174,600 doses. In accordance with the terms of the Contract, the Delivery Order acknowledged that GIV's obligation to deliver flu vaccine was contingent on the FDA's approval of the vaccine.

9. On or about August 25, 2004, Chiron notified the FDA that it had discovered bacterial contamination in eight lots of final vaccine produced for the 2004/2005 flu season. The contamination at Chiron's Liverpool facility was not due to the negligence or fault of GIV, which has no contact with that facility.

10. On September 28, 2004, and despite the August contamination problem with the eight lots, Chiron's CEO, Howard Pien, testified before the United States Senate Special Committee on Aging that Chiron nonetheless expected to be able to release between 46 million and 48 million doses of Fluvirin® to the United States beginning in early October 2004. Had Chiron been able to do that, GIV would have been able to perform its contract with DSCP.

11. However, between September 28 and 30, 2004, the Medicines and Healthcare Products Regulatory Agency ("MHRA"), England's counterpart to the FDA, conducted an inspection of Chiron's Liverpool manufacturing facility, and, on October 5, 2004, it suspended Chiron's license to operate for three months. The announcement was an enormous surprise to those involved with the distribution of flu vaccine and caused a huge shortage that was the subject of much press reporting at the time.

12. Only two days later, on October 7, 2004, DSCP purchased 25,000 packages of FluMist® from MedImmune, the manufacturer of FluMist®. GIV was the exclusive distributor of FluMist at that time. FluMist®, unlike Fluvirin®, is not an injectable vaccine; rather it is inhaled through the nose and does not have the salient characteristics of the flu vaccine required under the Contract. Specifically, the Contract requires an injectable purified surface antigen (dead) flu vaccine, suitable for all persons four years of age and older, that must be kept at a refrigerated (not frozen) temperature. FluMist® cannot be administered through an injection, it is a live vaccine, it is not suitable for all persons four years of age and older, and it must be stored in a frozen environment. FluMist® is more expensive than Fluvirin® because FluMist® requires special handling procedures, *i.e.*, it must be stored in a frost-free frozen state.

13. When DSCP purchased the FluMist® from GIV on October 7, 2004, it did not claim that GIV had "defaulted" under the Contract, did not tell GIV that it was purchasing the FluMist® as a substitute, and certainly did not say that it might later be claiming the excess purchase price as a reprocurement cost under the Contract.

14. On October 12, 2004, GIV notified DSCP that it would not be able to deliver Fluvirin® because of Chiron's inability to deliver the vaccine into this Country. Moreover, at the same time, GIV informed DSCP that it was making efforts to identify alternative sources of supply of injectable flu vaccine. A copy of GIV's letter to DSCP is attached as Exhibit 2.

15. On October 15, 2004, following the FDA's inspection of Chiron's Liverpool facility, the FDA embargoed the importation of Fluvirin® into the United States. In addition, the FDA declared that none of the Fluvirin® already in the U.S. could be distributed. The FDA's decision not to allow the release into the United States of any of Chiron's Fluvirin® created a "flu

shortage" because, aside from Fluvirin®, the only other FDA-approved injectable flu vaccine at that time was Fluzone®, manufactured by Aventis. While there was Aventis's Fluzone® available for use in this country, Aventis did not have enough time to manufacture enough extra Fluzone® to cover the shortage created by the Chiron situation.

16. In addition, the Department of Health and Human Services ("HHS") and the U.S. Centers for Disease Control and Prevention ("CDC") took control of the distribution of all available Fluzone® injectable flu vaccine. The distribution of flu vaccine also involved the Advisory Committee on Immunization Practices ("ACIP"), a federal inter-agency committee comprised of fifteen members, including the Assistant Secretary of Defense for Health. The ACIP, working with HHS and CDC, developed a re-allocation plan that, among other things, called for DOD to receive an amount of Fluzone® sufficient to cover 100% of all the injectable flu vaccine it had ordered through contracts with both Aventis and Chiron. Because of this plan, there should have been no need for any reprocurement by DSCP. As explained later, however, DOD made a voluntary decision to release the less expensive Fluzone® it could have used instead of the undeliverable Fluvirin®.

17. The ACIP restricted the distribution of injectable flu treatments by creating priority groups that included children under 2, people over 65, pregnant women, residents of nursing homes, and those of any age with one or more chronic medical conditions, such as diabetes, cardiac or respiratory disease, or immune disorder. Active military personnel generally did not meet the criteria to fall within a priority group for access to Fluzone®, however, pursuant to the ACIP's re-allocation plan, DOD nonetheless secured access to 100% of all the injectable flu vaccine it had ordered through contracts with both Aventis and Chiron.

18. ACIP, in conjunction with the CDC, FDA and HHS, directed the distribution of Fluzone® that became available after October 5, 2004 (the only available injectable flu vaccine supply) to federal and state agencies in accordance with the ACIP's re-allocation plan and distribution priorities.

19. HHS requested DOD to release its right of access to several hundred thousand doses of Fluzone® and, instead to use FluMist® nasal spray vaccine. Pursuant to this request, DSCP purchased 587,280 doses of FluMist® between October 7, 2004 and March 7, 2005. DOD voluntarily purchased the more expensive FluMist to replace the less expensive Fluzone that DOD could have used.

20. On November 15, 2004, DSCP's contracting officer issued a final decision terminating the Contract for cause, claiming that GIV had failed to make timely delivery under the Contract and that the failure to deliver was not due to excusable causes. A copy of that decision is attached as Exhibit 3. The November 15, 2004 decision did not assess excess reprocurement costs against GIV in connection with DSCP's earlier purchase of FluMist®. DSCP did reserve its right to acquire similar vaccine but, as explained above and below, FluMist is not a similar vaccine.

21. GIV appealed the contracting officer's November 15, 2004 decision terminating the Contract to the Armed Services Board of Contract Appeals ("ASBCA"). On August 31, 2006, the ASBCA upheld the contracting officer's termination of the Contract. A copy of that decision is attached as Exhibit 4. The ASBCA's decision is currently on appeal to the United States Court of Appeals for the Federal Circuit.

22. In the ASBCA proceeding, DSCP moved for summary judgment on the termination question and took the position that the ASBCA "lacked jurisdiction" to consider any excess reprocurement issue because DSCP had not made a final decision as to whether or not to assess excess reprocurement costs. A copy of DSCP's Motion for Summary Judgment is attached as Exhibit 5. Based on DSCP's representation, the ASBCA declared in its August 31, 2006 decision that it was ***not*** addressing the reprocurement issue because it lacked jurisdiction:

> Appellant finally argues that it is entitled to summary judgment on the issue of reprocurement costs. The government replies that it has not issued a demand for reprocurement costs and that the motion is therefore premature. There is no evidence of a contracting officer's decision or other demand for reprocurement costs (finding 16). We do not, therefore, have jurisdiction over the issue.

Exhibit 4 at 14.

23. Then, on December 11, 2006, DSCP's contracting officer did issue a final decision demanding that GIV pay the sum of $2,362,971.05, representing claimed excess costs purportedly incurred by DSCP in connection with its "reprocurement" of FluMist® to "fill the shortage created by GIV's inability to deliver" Fluvirin®. A copy of the December 11, 2006 decision is attached as Exhibit 6. According to the decision,

> GIV's failure to deliver any vaccine under the contract was as a result of Chiron's discovery of bacterial contamination in certain lots of vaccine produced for the 2004/2005 flu season. This led to a suspension of Chiron's license to operate and release any flu vaccine for importation to the U.S. until both British and U.S. authorities deemed the product safe and saleable....
>
> This represents the final decision of the Contracting Officer. You may appeal this decision to the Armed Services Board of Contract Appeals....In lieu of appealing to the Armed Services Board of Contract Appeals, you may bring an action directly in the U.S. Court of Claims (sic) within twelve (12) months from the date you receive this decision.

24. This action accepts the Contracting Officer's invitation to contest her final decision by bringing this action directly in this Court.

**DSCP Is Not Entitled To Excess Reprocurement Costs**

25. DSCP's reprocurement decision has no reasonable basis for several reasons (even assuming GIV is at fault at all, the issue now before the Federal Circuit).

**Voluntary Purchase of FluMist®**

26. First, DSCP did not need to buy the more expensive FluMist® because it could have purchased available, less expensive Fluzone®, but decided not to.

27. Before terminating the Contract, DSCP had arranged for DOD access to the injectable flu vaccine, Fluzone®, sufficient to meet its needs. DSCP voluntarily relinquished its right to Fluzone® and opted to purchase FluMist®. Thus, DSCP's purchase of FluMist® was not essential to secure a supply of flu vaccine.

**Purchase of FluMist® Before Asserted Default**

28. Second, DSCP purchased at least some of the FluMist® before it even knew that GIV would be unable to deliver the Fluvirin®; therefore, those purchases were not substitutes for unavailable Fluvirin®.

29. DSCP made its initial purchase of FluMist® on October 7, 2004, before GIV had indicated that Fluvirin® would be unavailable and before DSCP had made a determination that GIV had allegedly defaulted under the Contract. It was not until DSCP placed a follow-up order for FluMist® on March 7, 2005, that DSCP indicated on its purchase order that FluMist® was purportedly a reprocurement to replace the unavailable Fluvirin®.

**Purchase of Dissimilar Product**

30. Third, FluMist® is not, in any event, a reasonable substitute for Fluvirin® because, among other things, it does not have the same, or sufficiently similar, characteristics to Fluvirin®. The characteristics it does have, as set forth below, cause it to be both more expensive and less desirable in certain ways than either Fluvirin® or Fluzone®.

31. FluMist® could not have been substituted under the Contract. The Contract required GIV to deliver split or purified surface antigen flu vaccine for subcutaneous or intramuscular administration, *i.e.*, by injection. Fluvirin® satisfied the salient characteristics of the flu vaccine required under the Contract. FluMist®, on the other hand, delivers flu vaccine through a nasal spray; it cannot be administered by subcutaneous or intramuscular administration. Therefore, FluMist® does not satisfy the salient characteristics of the vaccine required under the Contract.

32. The Contract required GIV to deliver flu vaccine suitable for all persons six months of age and older, or at least four years of age and older. Fluvirin® is approved for use by persons who are at least six months of age, including those who are healthy and those with chronic medical conditions. FluMist®, on the other hand, is approved for use only among healthy persons who are five to forty-nine years of age. Therefore, FluMist® does not satisfy the salient characteristics of the vaccine required under the Contract.

33. The Contract requires the ordered flu vaccine to be kept refrigerated, but the vaccine cannot be frozen. Fluvirin® is an inactivated (dead), purified surface antigen vaccine that must be kept at refrigerated temperature. Therefore, Fluvirin® satisfies the salient characteristics of the flu vaccine required under the Contract.

34. FluMist®, on the other hand, is a live attenuated vaccine, still capable of replication. Because FluMist® contains live virus, it must be stored in a frozen state at or below 5°F. Between the point of manufacture and the point of administration to an individual, FluMist® must be stored continuously in a special non-frost freezer. FluMist® is so sensitive that storage in a frost-freezer subjects the product to instability due to the normal temperature cycle of the freezer.

35. Because of the extraordinary storage requirements for FluMist®, the cost of acquiring, transporting and storing FluMist® is substantially more than the cost of Fluvirin®.

36. Because of the substantial differences between Fluvirin® and FluMist®, DSCP did not make a reasonable reprocurement of a similar product when it purchased FluMist® following the unavailability of Fluvirin® in October of 2004.

37. For each and all of these reasons, DSCP's purchase of FluMist does not constitute a "reprocurement" that was reasonable or necessary to "mitigate" the unavailability of Fluvirin.

**Untimely Demand for Payment**

38. DSCP's reprocurement decision was also untimely. It terminated the Contract on November 15, 2004, but did not issue a demand for excess reprocurement costs until December 11, 2006 – more than two years later.

39. DSCP's delay in asserting a claim for excess reprocurement costs violates FAR 32.610(a).

40. For the foregoing reasons, DSCP is not entitled to claim excess reprocurement costs in connection with its purchase of FluMist®.

## Prayer for Relief

WHEREFORE, GIV requests judgment against the United States as follows:

1. for an Order that the United States is not entitled to any excess reprocurement costs in connection with GIV's contract to deliver the unavailable Fluvirin®;

2. for an Order awarding GIV its costs of suit; and,

3. for such other and further relief allowed by law as the Court finds is just and proper.

Dated: 3/9/07

Respectfully submitted,

PROSKAUER ROSE LLP

By: Joseph E. Casson

Joseph E. Casson (D.C. Bar No. 22590)
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004
Tel: (202) 416-6800
Fax: (202) 416-6899

Attorneys for Plaintiff

Of counsel:

Bruce E. Fader
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900