**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

GENERAL INJECTABLES &
VACCINES, INC.,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

No. 07-156C
(Judge Williams)

Filed Electronically on August 20, 2008

**MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR JUDGMENT ON THE**
**PLEADINGS OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT**

*Of Counsel*:
James F. Segroves
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533
202.416.6871
202.416.6899 (fax)
jsegroves@proskauer.com

Bruce E. Fader
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
212.969.3415
212.969.2900 (fax)
bfader@proskauer.com

*Attorney of Record for Plaintiff*
*General Injectables & Vaccines, Inc.*

# TABLE OF CONTENTS

Page

QUESTIONS PRESENTED ........ 1

STATEMENT OF THE CASE ........ 2

A. The Fluvirin Contract ........ 2

B. Chiron Contamination, DSCP's Pre-Termination FluMist Purchase and DSCP's Termination of the Fluvirin Contract for Cause ........ 4

C. Differences Between Fluvirin and FluMist ........ 6

D. DSCP's Post-Termination FluMist Purchases ........ 8

E. GIV's Administrative Appeal of the Termination for Cause ........ 8

F. DSCP's Written Demand for Excess Reprocurement Costs ........ 10

G. Reduction in the Amount of Excess Reprocurement Costs Demanded ........ 10

H. Federal Circuit Proceedings ........ 11

STANDARD OF REVIEW ........ 11

ARGUMENT ........ 12

I. DEFENDANT'S UNTIMELY DEMAND FOR EXCESS REPROCUREMENT COSTS SHOULD BE REJECTED ........ 12

A. Applicable Regulations Require That a Demand for Excess Reprocurement Costs Be Made Without Delay After Completion and Final Payment of the Repurchase Contract ........ 12

B. Defendant Waited Seventeen Months After Completion and Final Payment of the Repurchase Contract to Assert Its Demand for Excess Reprocurement Costs ........ 17

C. GIV Was Prejudiced by Defendant's Persistent Refusal to Issue a Timely Demand for Excess Reprocurement Costs ........ 17

II. DEFENDANT IS NOT ENTITLED TO EXCESS REPROCUREMENT COSTS BECAUSE IT PURCHASED A DISSIMILAR PRODUCT ........ 20

A. The Government May Recover Excess Reprocurement Costs Only If the Reprocured Supplies Are Sufficiently Similar to Those for Which the Government Originally Contracted ........ 20

B. There Are Substantial and Material Differences Between Fluvirin and FluMist, and They Are Not Sufficiently Similar To Form the Basis of an Excess-Reprocurement-Cost Claim ........................................... 24

III. DEFENDANT CANNOT RECOVER EXCESS REPROCUREMENT COSTS FOR VACCINE PURCHASED OVER ONE MONTH BEFORE GIV'S CONTRACT TERMINATION......................................................................25

CONCLUSION........................................................................................................... 26

APPENDIX:

Appendix, *General Injectables & Vaccines, Inc. v. Gates*, No. 2007-1119 (Fed. Cir.) (filed July 12, 2007)

Armed Services Board of Contract Appeals ("ASBCA") decision dated August 31, 2006 ……………………………………………………………... 1

Docket Sheet ……………………………………………………………………… 17

Appellee's Rule 4 File ………………..…………………………………………… 21

Appellant's Complaint …………………………………………………………... 130

Appellee's Answer to Appellant's Complaint …………………………………... 155

Appellant's Request for Hearing dated April 7, 2005 ………………………….... 167

Appellee's Motion for Summary Judgment ……………………………………... 168

Appellant's Letter to the ASBCA dated June 14, 2005, regarding proposed hearing dates and other procedural issues …………………………………………….. 180

Appellant's Opposition to Appellee's Motion for Summary Judgment and Cross-Motion for Summary Judgment …………………………………………… 182

Appellee's Reply to Appellant's Response to Motion for Summary Judgment ……… 204

Appellant's Letter to the ASBCA dated October 19, 2005, in response to Appellee's Reply to Appellant's Response to Motion for Summary Judgment ……… 208

Plaintiff's Proposed Findings of Uncontroverted Facts ……….…………………….. 218

Declaration of Tracy B. Puckett ……………..………………………………….. 228

# TABLE OF AUTHORITIES

Page(s)

## CASES

*American Mining Congress v. Mine Safety & Health Admin.*,
995 F.2d 1106 (D.C. Cir. 1993) ............ 13

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ............ 11, 12

*Atchison, T. & S. Fe R.R. v. Scarlett*,
300 U.S. 471 (1937) ............ 13

*Cascade Pac. Int'l v. United States*,
773 F.2d 287 (Fed. Cir. 1985) ............ 20, 23

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) ............ 12

*CJP Contractors, Inc. v. United States*,
45 Fed. Cl. 343 (1999) ............ 23

*Consolidated Airborne Sys., Inc. v. United States*,
348 F.2d 941 (Ct. Cl. 1965) ............ 22

*Davies Precision Machining, Inc. v. United States*,
35 Fed. Cl. 651 (1996) ............ 13, 19

*Environmental Tectonics Corp.*,
ASBCA No. 21204, 1978 WL 2061 ............ 20, 21

*General Injectables & Vaccines, Inc. v. Gates*,
519 F.3d 1360 (Fed. Cir.), *opinion supplemented on denial of reh'g & reh'g en banc*, 527 F.3d 1375 (Fed. Cir. 2008) ............ 11

*General Injectables & Vaccines, Inc.*,
ASBCA No. 54930, 2006 WL 2589950 ............ 9, 19

*Gould, Inc. v. United States*,
935 F.2d 1271 (Fed. Cir. 1991) ............ 11

*Mingus Constructors, Inc. v. United States*,
812 F.2d 1387 (Fed. Cir. 1987) ............ 12

*Paul v. United States*,
371 U.S. 245 (1963) ............ 13

*Peterson v. United States*,
68 Fed. Cl. 773 (2005) .......... 11

*Public Utilities Comm'n of Cal. v. United States*,
355 U.S. 534 (1958) .......... 13

*Rose Printing, Inc.*,
GPOBCA No. 32-95, 1996 WL 812880 .......... 26

*Rosenberg v. United States*,
76 Ct. Cl. 662, 1933 WL 1837 .......... 23

*Schwartz v. United States*,
65 F. Supp. 391 (Ct. Cl. 1946) .......... 22, 25

*Seaboard Lumber Co. v. United States*,
308 F.3d 1283 (Fed. Cir. 2002) .......... 23, 24

*Sharman Co. v. United States*,
24 Cl. Ct. 763 (1991) .......... 15

*SMS Data Prods. Group Inc. v. United States*,
853 F.2d 1547 (Fed. Cir. 1988) .......... 14, 15

*United States v. Axman*,
234 U.S. 36 (1914) .......... *passim*

## STATUTES

41 U.S.C. § 607(g)(1)(A) .......... 9

41 U.S.C. § 609(a)(1) .......... 10

## RULES AND REGULATIONS

33 Fed. Reg. 7347 (May 18, 1968) .......... 16

48 Fed. Reg. 42,101 (Sept. 19, 1983) .......... 16

FAR 12.403(c)(2) .......... 26

FAR 32.610(a) .......... *passim*

FAR 49.402-6 .......... 12, 14, 16

FAR 49.402-6(a) .......... 12, 26

FAR 49.402-6(b) .......... 14, 15

FAR 49.402-6(c) ........ *passim*

R. Ct. Fed. Cl. 12(c) ........ 1, 11

R. Ct. Fed. Cl. 56 ........ 11

R. Ct. Fed. Cl. 56(a) ........ 1

R. Ct. Fed. Cl. 56(c) ........ 11

**SUPERSEDED REGULATIONS**

32 C.F.R. § 8.602-6 (1970) ........ 16

32 C.F.R. § 8.602-6(c) (1970) ........ 16

**OTHER AUTHORITIES**

2 James Wm. Moore et al., *Moore's Federal Practice* § 12.38 (3d ed. 2008) ........ 11

*Webster's New World Dictionary* (3d ed. 1988) ........ 15

Plaintiff General Injectables & Vaccines, Inc. ("GIV") respectfully submits this memorandum of law in support of its motion for judgment on the pleadings or, alternatively, for summary judgment pursuant to Rules 12(c) and 56(a) of the Rules of the Court of Federal Claims ("RCFC").

## QUESTIONS PRESENTED

1. Whether GIV is entitled to judgment as a matter of law in this excess-reprocurement-cost case because Defendant United States ("Defendant"), acting through the Defense Supply Center Philadelphia ("DSCP"), waited more than a year and a half after completing payment for its purchase of flu virus vaccine it claims is replacement vaccine to issue a formal, written demand for excess reprocurement costs, when (a) the Federal Acquisition Regulation ("FAR") instructs that such demands must be issued "without delay" after "completion and final payment of the repurchase contract," and (b) DSCP persisted in refusing to issue a formal, written demand for excess reprocurement costs when GIV raised the issue in pending proceedings before the Armed Services Board of Contract Appeals ("the Board"), which prejudiced GIV by depriving it of the opportunity to adjudicate the propriety of DSCP's demand in an already-pending administrative proceeding concerning the propriety of DSCP's termination for cause, thereby resulting in unnecessary litigation in this Court and significant added expense to GIV.

2. Whether GIV is entitled to judgment as a matter of law because the replacement flu virus vaccine Defendant purchased was not sufficiently similar to that for which Defendant originally contracted, because the original contract required the vaccine to be injectable and suitable for persons four years of age or older and Defendant replaced the contracted-for product with a much more expensive inhalable flu virus vaccine with a more narrow range of approved uses.

3. Whether GIV is entitled to judgment as a matter of law rejecting that portion (i.e., 250,000 out of 587,950 doses) of Defendant's demand for excess reprocurement costs related to Defendant's purchase of flu virus vaccine more than one month **before** it terminated GIV's original contract for cause.

## STATEMENT OF THE CASE

### A. The Fluvirin Contract

DSCP is a field activity of the Defense Logistics Agency, which is a subagency within the United States Department of Defense. (ASBCA Compl. ¶ 2, App. 131; ASBCA Answer ¶ 2, App. 155.)[1] On January 14, 2004, DSCP issued Solicitation No. SPO 200-04-R-0005 seeking bids for the delivery of injectable flu virus vaccine. (Compl. ¶ 4; Answer ¶ 4.) That solicitation contained three contract line item numbers ("CLINs"), all three of which stated that the vaccine had to be "suitable for subcutaneous or intramuscular administration"—i.e., the vaccine had to be injectable. (Compl., Ex. 1 at 23, 25, 27.) Injectable flu vaccines were considerably less expensive than the inhalable one for various reasons discussed below.

The specification sheet for the first CLIN provided as follows:

> ITEM IDENTIFICATION: INFLUENZA VIRUS VACCINE, USP, TRIVALENT, SPLIT OR PURIFIED SURFACE ANTIGEN, 0.5 ML DOSE, 10 DOSE, 1's
>
> SALIENT CHARACTERISTICS
>
> Shall be Influenza Virus Vaccine, USP.

[1] References to "App." are to the appendix filed by GIV in *General Injectables & Vaccines, Inc. v. Gates*, No. 2007-1119 (Fed. Cir.), a copy of which is included in the appendix to this memorandum of law. References to "ASBCA" pleadings are to those filed in Armed Services Board of Contract Appeals docket number 54930.

> Shall be a Trivalent, Split or Purified Surface Antigen Vaccine for intramuscular administration, for immunizing persons 6 months of age or older OR 4 years of age or older.
>
> Shall be suitable for subcutaneous or intramuscular administration.
>
> Shall be in accordance with the requirements of the USP.
>
> The formula for the 2004-2005 season shall be as required in the solicitation.
>
> Expiration date shall be 30 June 2005 or later.
>
> Material shall be shipped under constant refrigeration: 2° - 8° C (35° - 46° F).
>
> Unit: Vial (VI). One vial containing 10 doses, as specified, constitutes one unit.

(Compl., Ex. 1 at 23.)

GIV offered to meet the solicitation's requirements by supplying Fluvirin, which is an injectable flu virus vaccine manufactured by Chiron Vaccines ("Chiron") in the United Kingdom. (Compl. ¶ 5; Answer ¶ 5.) On April 21, 2004, DSCP awarded GIV Contract No. SPO 200-04-D-0003 (the "Fluvirin Contract") for an indefinite quantity of injectable flu vaccine. (Compl. ¶ 7; Answer ¶ 7.) The Fluvirin Contract contained two CLINs, the first of which called for an annual estimated quantity of 226,846 10-dose vials of injectable flu vaccine suitable for immunizing persons four years of age and older <u>at a price of $64.60 per 10-dose vial</u>. (Compl., Ex. 1 at 96.) The second CLIN called for an annual estimated quantity of 17,460 packages of 10 single-dose, pre-filled syringe units containing injectable flu vaccine suitable for immunizing persons four years of age and older at a per package price of $86.00. (*Id.*) Based on these annual estimated quantities, the Fluvirin Contract called for $16,155,811.60 in injectable flu vaccine. (*Id.*)

That same day, DSCP issued a delivery order for 226,846 vials of vaccine and 17,460 packages of pre-filled syringe units, 25 percent of which was scheduled to be delivered no later than September 30, 2004. (Compl. ¶ 8; Compl., Ex. 1 at 103; Answer ¶ 8.)

### B. Chiron Contamination, DSCP's Pre-Termination FluMist Purchase and DSCP's Termination of the Fluvirin Contract for Cause

On or about August 25, 2004, Chiron notified the United States Food and Drug Administration ("FDA") that Chiron had discovered bacterial contamination in eight lots of final vaccine produced for the 2004-2005 flu season in its Liverpool, England facility. (Compl. ¶ 9; Answer ¶ 9.) Chiron also notified the FDA that Chiron could not release any flu vaccine for importation into the United States until both British and United States authorities affirmatively deemed its product safe and saleable. (ASBCA Compl. ¶ 9; ASBCA Answer ¶ 9.)

Despite the August contamination report, on September 28, 2004, Chiron's chief executive officer appeared before a committee of the United States Senate and testified that Chiron expected to release between 46 million and 48 million doses of Fluvirin to the United States beginning in early October 2004. (Compl. ¶ 10; Answer ¶ 10.) However, between September 28 and 30, 2004, the Medicines and Healthcare Products Regulatory Agency ("MHRA"), England's counterpart to the FDA, conducted an inspection of Chiron's Liverpool manufacturing facility, and, on October 5, 2004, MHRA suspended Chiron's license to operate for three months. (Compl. ¶ 11; Answer ¶ 11.)

Two days later, on October 7, 2004, DSCP purchased from GIV 25,000 packages of 10 single-dose, single-use FluMist sprayers <u>at a per package price of $104.79</u>. (Compl. ¶ 12; Answer ¶ 12.) DSCP did not assert in its purchase order that GIV had "defaulted" under the Fluvirin Contract, or otherwise give GIV any notice that the purchased FluMist was intended to replace the Fluvirin vials or pre-filled syringes DSCP had already ordered. (Compl. ¶ 13; Answer ¶ 13; Puckett Decl., Ex. 1.)

By letter dated October 12, 2004, GIV's parent company notified DSCP that GIV would be unable to deliver Fluvirin because of Chiron's inability to supply the vaccine in either vial or

pre-filled syringe form. (Compl. ¶ 14; Answer ¶ 14.) On October 15, 2004, following the FDA's inspection of Chiron's Liverpool facility, the FDA embargoed the importation of Fluvirin into the United States. (Compl. ¶ 15; Answer ¶ 15.) In addition, the FDA declared that none of the Fluvirin already in the United States could be distributed. (Compl. ¶ 15; Answer ¶ 15.) Aventis, which made an injectable flu virus vaccine known as Fluzone, did not have enough time to manufacture enough extra Fluzone to cover the shortage created by the Chiron situation. (Compl. ¶ 15; Answer ¶ 15.)

On November 1, 2004, the DSCP Contracting Officer completed a three-page "DETERMINATIONS AND FINDINGS" ("D&F"). (App. 113-15.) Among other things, the Contracting Officer described how on October 7, 2004, DSCP had ordered 25,000 packages of FluMist from GIV. (D&F ¶ 9, App. 114-15.) The D&F stated that the Government intended to terminate the Fluvirin Contract for cause (D&F ¶ 7, App. 114), and "[i]n accordance with FAR 12.403(c)(2), the Government intend[ed] to assert its right to acquire similar items in another contracting action and to charge GIV with any excess reprocurement costs together with any incidental or consequential damages incurred because of the termination" (D&F ¶ 8, App. 114).

The Contracting Officer's D&F also stated that, on October 21, 2004, DSCP had ordered 50,000 vials of injectable Fluzone from Aventis at a price of $63.31 per 10-dose vial, which was $1.29 less than the per-vial price under the Fluvirin Contract. (D&F ¶ 9, App. 114-15.)

On November 15, 2004, the Contracting Officer issued a final decision terminating GIV's Fluvirin Contract for cause, asserting that GIV had failed to make timely delivery and that the failure to deliver was not excusable. (Compl. ¶ 20; Compl., Ex. 3; Answer ¶¶ 20, 65.) The November 15, 2004 decision did not assess excess reprocurement costs against GIV in connection with DSCP's October 7, 2004 purchase of FluMist, stating only: "The [G]overnment reserves all

rights and remedies provided by law and as provided by the contract. In accordance with FAR 12.403(c)(2), the Government intends to assert its right to acquire similar items in another contracting action and to charge GIV with any excess reprocurement costs together with any incidental or consequential damages incurred because of the termination." (Compl., Ex. 3 at 2.) Again, the Government did not claim that its pre-termination FluMist purchase constituted, in its view, a reprocurement. Its statement, fairly read, seemed prospective only and gave GIV no notice of what the Government was later to claim with respect to the 250,000 FluMist doses it had already ordered.

**C. Differences Between Fluvirin and FluMist**

Fluvirin and FluMist are very different products, which is reflected by the fact that during the 2004-2005 flu season, one package of 10 single-dose FluMist single-use sprayers ($104.79) cost approximately 66 percent more than one 10-dose vial of injectable Fluvirin ($63.31). (*See* Compl. ¶ 12; Compl., Ex. 1 at 96; Answer ¶ 12.) One package of 10 single-dose FluMist single-use sprayers ($104.79) also cost approximately 22 percent more than one package of 10 single-dose, pre-filled syringe units containing Fluvirin ($86.00). (*See id.*) Several factors accounted for the significant price difference between Fluvirin and FluMist.

First, Fluvirin and FluMist are very different products in how they are administered into the body. FluMist, which is manufactured by MedImmune Vaccines, Inc., cannot be injected with a needle; rather it is easily inhaled through the nose. (Compl. ¶ 12; Answer ¶ 12.) Unlike Fluvirin, FluMist contains live flu virus and does not contain the preservative thimerosal.

(Puckett Decl. ¶ 10.)[2] Moreover, during the 2004-2005 flu season, FluMist was approved for a more narrow range of persons, i.e., only healthy persons between the ages of five and forty-nine. (Compl. ¶ 12; Answer ¶ 12; Puckett Decl. ¶ 11.)

Second, for these reasons, FluMist, unlike Fluvirin, required special handling procedures because it had to be stored and shipped in a frost-free frozen state. (Puckett Decl. ¶ 8.) Generally speaking, injectable flu vaccine needs to be transported at two to eight degrees Celsius, which temperature can be maintained by refrigerated shipping. (*Id.*) During the 2004-2005 flu season, however, FluMist had to be shipped frozen. (*Id.*) GIV would process orders for FluMist and have the vaccine shipped directly from the manufacturer to the customer. (*Id.*) The manufacturer shipped FluMist to the customer, packing it with dry ice to keep the product frozen. (*Id.*)

Third, the significant price difference between Fluvirin and FluMist is also reflective of the fact that the processing of FluMist orders was much more complicated than orders for Fluvirin. (*Id.* ¶ 9.) For example, prior to the customer receiving a shipment of FluMist, GIV had to make sure that the customer also received specially designed freeze boxes to store the product and to make sure that the customer clearly understood what type of freezer and the amount of freezer space were required for storing FluMist. (*Id.*) GIV then had to notify the customer before the arrival date of the shipment to ensure that the freeze box had been conditioned by being frozen at least four days before arrival of the FluMist. (*Id.*)

---

[2] References to "Puckett Decl." are to the August 20, 2008 Declaration of Tracy B. Puckett, Manager for Corporate Accounts, General Injectables & Vaccines, Inc., a copy of which is attached to GIV's Proposed Findings of Uncontroverted Facts.

**D. DSCP's Post-Termination FluMist Purchases**

DSCP made additional purchases of FluMist from GIV throughout the remainder of 2004 and early 2005, eventually ordering 33,795 additional packages of FluMist for a total of 58,795 packages at a per package price of $104.79 at a total cost of $6,161,128.05. (Answer ¶¶ 66, 69.) The total cost of the FluMist DSCP purchased was $9,994,683.55 less than what would have been the purchase price under the Fluvirin Contract, though the unit cost was considerably higher. DSCP paid for the last of its FluMist purchases for the 2004-2005 flu season no later than June 13, 2005. (Puckett Decl. ¶ 12.)

**E. GIV's Administrative Appeal of the Termination for Cause**

Meanwhile, on March 14, 2005, GIV appealed the Contracting Officer's termination of the Fluvirin Contract for cause to the Armed Services Board of Contract Appeals (the "Board"). (ASBCA Compl., App. 130-54.) GIV also challenged DSCP's ability to demand excess reprocurement costs stemming from the agency's FluMist purchases. (ASBCA Compl. ¶¶ 79-96, App. 149-53.) In so doing, GIV explained to the Board that, in a telephone conference on February 10, 2005, DSCP had informed GIV that DSCP would seek approximately $2,300,000 in excess reprocurement costs, which DSCP alleged represented the difference in cost between the Fluvirin and the FluMist DSCP had ordered. (ASBCA Compl. ¶ 29, App. 138.)

In response, DSCP admitted that "during a February 10, 2005 telecon [sic] DSCP advised [GIV] that the delta between the cost of Fluviron [sic] ordered under the Contract and FluMist was approximately $2,300,000." (ASBCA Answer ¶ 29, App. 159.) DSCP nonetheless argued that the Board lacked jurisdiction to consider the excess-reprocurement-cost issue because DSCP had not made a formal demand for such costs. (Compl. ¶ 22; Answer ¶ 22.)

On July 8, 2005—twenty-five days after GIV received final payment for the last of DSCP's FluMist purchases—DSCP filed a motion for summary judgment in the Board proceeding, arguing that the Board lacked jurisdiction to decide GIV's challenge to DSCP's ability to demand excess reprocurement costs because "there is no Government claim [for excess reprocurement costs] to challenge, as the Government has not yet issued any demand for excess reprocurement costs." (ASBCA DSCP Mot. for Summ. J. at 11, App. 178.)

In response, GIV argued that there was no reason for DSCP to withhold issuance of a formal demand for excess reprocurement costs if it intended to pursue reprocurement, explaining:

> This case does not present a situation where the Government cannot yet quantify the amount of its alleged damages, or a situation where the Government is still in the process of rebidding a contract. DoD "reprocured" FluMist® in October 2004, quantified the "delta" between the cost of Fluvirin® under the Contract and the cost of FluMist® it purchased prior to its termination of GIV's Contract, and notified GIV of its claim for reprocurement costs in February [2005].

(ASBCA GIV Cross-Mot. for Summ. J. at 18, App. 199.)

Nonetheless, DSCP persisted in its position. On September 13, 2005—more than three months after GIV had received final payment for the last of DSCP's FluMist purchases—DSCP again told the Board that its claim for excess reprocurement costs had "not matured yet" and that "no Government demand for costs has been issued." (ASBCA DSCP Reply in Supp. of Mot. for Summ. J. at 4, App. 207.)

In a written opinion issued on August 31, 2006, the Board upheld the Contracting Officer's decision terminating the Fluvirin Contract for default, and also accepted DSCP's position that it should not consider the "propriety of government reprocurement actions" in the absence of a formal, written demand for excess reprocurement costs. *See General Injectables & Vaccines, Inc.*, ASBCA No. 54930, 2006 WL 2589950, at *11.

**F. DSCP's Written Demand for Excess Reprocurement Costs**

At the earliest, GIV had until December 29, 2006, to appeal the Board's decision to the United States Court of Appeals for the Federal Circuit. *See* 41 U.S.C. § 607(g)(1)(A) (providing that contractor may appeal Board's decision to the Federal Circuit within 120 days "after the date of receipt of a copy of such decision"). Shortly before GIV was set to file its notice of appeal, GIV received a letter from DSCP dated December 11, 2006, in which DSCP demanded $2,362,971.05 in excess reprocurement costs from GIV. (Compl. ¶ 23; Compl., Ex. 6; Answer ¶ 23.) According to DSCP's demand letter:

> The Government ultimately substituted FluMist® to compensate for the undelivered doses [of Fluvirin]. The amount shown above represents the price difference between the FluMist® package (10 doses) and GIV's vial (10 doses) price. The Government purchased in total 58,795 packages of FluMist® to fill the shortage created by GIV's inability to deliver.

(Compl., Ex. 6 at 1.) No explanation was, or has ever been, given as to why DSCP had waited so long to issue a formal, written demand for excess reprocurement costs.

After filing its notice of appeal in the Federal Circuit, GIV initiated the instant action on March 9, 2007, in order to challenge DSCP's December 11, 2006 demand for excess reprocurement costs pursuant to 41 U.S.C. § 609(a)(1). Among other things, GIV asked for an order declaring that Defendant was not entitled to excess reprocurement costs. (Compl. at 11.)

**G. Reduction in the Amount of Excess Reprocurement Costs Demanded**

On July 7, 2007, Defendant filed its Answer and Counterclaim to GIV's Complaint in this case. In it, Defendant admitted that DSCP's demand for $2,362,971.05 in excess reprocurement costs had been overstated because DSCP had failed to take into account the fact that DSCP had voluntarily relinquished its right to 20,000 vials of Fluzone and that 50,000 vials of Fluzone it claimed to have acquired from Aventis was slightly cheaper than the Fluvirin it had

contracted to purchase from GIV. (Answer ¶¶ 70-73.) In all, Defendant reduced its demand for excess reprocurement costs by $868,300, to $1,494,671.05. (*Id.* ¶ 75.)

After GIV answered Defendant's counterclaim, this Court stayed the instant action on September 14, 2007, pending the outcome of GIV's Federal Circuit appeal.

### H. Federal Circuit Proceedings

On March 19, 2008, a three-judge panel of the Federal Circuit upheld the Board's decision. *See General Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360 (Fed. Cir. 2008). On June 3, 2008, the Federal Circuit issued a supplemental opinion denying GIV's combined petition for panel rehearing and rehearing en banc. *See General Injectables & Vaccines, Inc. v. Gates*, 527 F.3d 1375 (Fed. Cir. 2008). This Court reactivated the instant case shortly thereafter.

## STANDARD OF REVIEW

RCFC 12(c) provides that "[a]fter the pleadings are closed, but within such time as not to delay the trial, any party may move for judgment on the pleadings." "The legal standard applied to evaluate a motion for judgment on the pleadings is the same as that for a motion to dismiss." *Peterson v. United States*, 68 Fed. Cl. 773, 776 (2005). In considering a motion for judgment on the pleadings, a court must "assume all well-pled factual allegations are true and indulge in all reasonable inferences in favor of the nonmovant." *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). "In determining the motion, the court may consider any of the pleadings, including the complaint, the answer, and any written instruments attached to them." 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.38 at 12-135 (3d ed. 2008).

Rule 12(c) also provides that "[i]f, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in RCFC 56 . . . ." A court may grant

a motion for summary judgment if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." RCFC 56(c). A genuine issue is one that "may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A fact is material if it "might affect the outcome of the suit." *Id.* at 248. The movant has the burden of establishing the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once this burden is met, the onus shifts to the non-movant to point to sufficient evidence to show a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor. *Liberty Lobby*, 477 U.S. at 256. Mere denials, conclusory statements, or evidence that is merely colorable or not significantly probative will not defeat summary judgment. *Celotex*, 477 U.S. at 324; *Liberty Lobby*, 477 U.S. at 249-50; *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987).

## ARGUMENT

### I. DEFENDANT'S UNTIMELY DEMAND FOR EXCESS REPROCUREMENT COSTS SHOULD BE REJECTED

#### A. Applicable Regulations Require That a Demand for Excess Reprocurement Costs Be Made Without Delay After Completion and Final Payment of the Repurchase Contract

The FAR states that "[a] demand for payment shall be made as soon as the responsible official has computed the amount of refund due." FAR 32.610(a). In the case of debts arising from "excess costs for a default termination," however, the FAR speaks in far stricter terms, instructing that a demand for payment "shall be made without delay, as explained in 49.402-6." *Id.*

FAR 49.402-6, in turn, provides that "[w]hen the supplies or services are still required *after* termination, the contracting officer shall repurchase the same or similar supplies or services against the contractor's account as soon as practicable." FAR 49.402-6(a) (emphasis added). "If

repurchase is made at a price over the price of the supplies or services terminated," the FAR instructs that the "contracting officer *shall*, after completion and final payment of the repurchase contract, make a written demand on the contractor for the total amount of the excess, giving consideration to any increases or decreases in other costs such as transportation, discounts, etc." FAR 49.402-6(c) (emphasis added).

Therefore, read together, FAR 32.610(a) and 49.402-6(c) provide that, if the Government wishes to issue a demand for excess reprocurement costs, it must do so "without delay" after "completion and final payment of the repurchase contract." One can easily understand the policy reasons underlying such a requirement, having to do with fair and timely notice that a claim is being made and allowing the tribunal adjudicating the underlying termination for cause to deal with the Government's claims all together, rather than piecemeal.

In any event, the FAR provisions are clear on their face, and the law is clear that substantive regulations such as the FAR have the force of law and should be applied according to their clear terms. *See Davies Precision Machining, Inc. v. United States*, 35 Fed. Cl. 651, 657 (1996); *American Mining Congress v. Mine Safety & Health Admin.*, 995 F.2d 1106, 1109 (D.C. Cir. 1993); *see also Paul v. United States*, 371 U.S. 245, 255 (1963) (holding that Armed Services Procurement Regulation had "force of law" such that it controlled over contrary state statute); *Public Utilities Comm'n of Cal. v. United States*, 355 U.S. 534, 542-43 (1958) (same); *Atchison, T. & S. Fe R.R. v. Scarlett*, 300 U.S. 471, 474 (1937) ("The regulation having been made by the [agency] in pursuance of constitutional statutory authority, it has the same force as though prescribed in terms by the statute.").

Although research indicates that neither this Court nor the Federal Circuit have had occasion to interpret these FAR provisions as they relate to the timing of a demand for excess repro-

curement costs—presumably because most federal agencies issue such demands in a timely fashion—the plain meaning of these FAR provisions indicates that the drafters of the FAR intended to restrict contracting-officer discretion as to the timing of when to issue a demand for excess reprocurement costs.

The Federal Circuit faced an analogous situation in *SMS Data Products Group Inc. v. United States*, 853 F.2d 1547 (Fed. Cir. 1988). There, the Court of Appeals was asked to interpret the FAR's instruction that, in cases of reprocurement following a default termination, the contracting officer "*shall* obtain competition to the maximum extent practicable for the repurchase." FAR 49.402-6(b) (emphasis added). At issue was an agency appeals board ruling affirming a contracting officer's decision to exclude the defaulting contractor from consideration during the reprocurement process. *See* 853 F.2d at 1551-53.

As the Court of Appeals had no established interpretation of FAR 49.402-6(b) on which to draw, it looked to the plain meaning of the words used in the regulation, explaining:

> As one would expect, use of the word "shall" in the phrase "shall obtain competition to the maximum extent practicable" denotes the imperative. . . . As to the word "practicable," in common usage it means "possible to practice or perform," or "capable of being put into practice, done, or accomplished: feasible." *Webster's Third New International Dictionary* (1971). Thus, the contracting officer did not have unbridled discretion in conducting the reprocurement, but was required to conduct the reprocurement in the most competitive manner feasible. Finally, "competition" has many meanings; of those, "the effort of two or more parties to secure the custom of a third party by the offer of the most favorable terms," *id.*, seems most reasonable in the context of this regulation.

*Id.* at 1553-54 (citation omitted).

Although recognizing that the words used by FAR 49.402-6 were somewhat ambiguous as to how they should be applied in the abstract, the Court of Appeals determined that the words could be given "concrete meaning through a process of case-by-case adjudication." *Id.* at 1554. Under the facts presented, the Federal Circuit held that the board had committed legal error and

sustained the defaulting contractor's protest because the contracting officer had excluded the defaulting contractor from consideration during the reprocurement process, which did not conform to FAR 49.402-6(b)'s pro-competition requirement. *See id.* at 1555-56.

In like fashion, Defendant here did not have "unbridled discretion" as to when it could issue a demand for excess reprocurement costs. Instead, the FAR required that such a demand be issued "without delay" after "completion and final payment of the repurchase contract." FAR 32.610(a), 49.402-6(c).

As in *SMS Data Products*, the FAR provisions at issue in this case both use the word "shall" to denote the imperative. *See* FAR 32.610(a) ("If the debt arises from excess costs for a default termination, the demand *shall* be made without delay, as explained in 49.402-6.") (emphasis added), 49.402-6(c) ("If repurchase is made at a price over the price of the supplies or services terminated, the contracting officer *shall*, after completion and final payment of the repurchase contract, make a written demand on the contractor for the total amount of the excess, giving consideration to any increases or decreases in other costs such as transportation, discounts, etc.") (emphasis added).

Moreover, FAR 32.610(a)'s use of the words "without delay" reinforces the policy concept the FAR is advancing (i.e., providing fair and timely notice that a claim is being made and allowing the tribunal adjudicating the underlying termination for cause to deal with the Government's claims all together, rather than piecemeal). While the facts of different cases may drive different applications, the facts here—that DSCP waited more than seventeen months to demand excess reprocurement costs from GIV—seem to be undisputed. *See SMS Data Products*, 853 F.2d at 1554; *see also Sharman Co. v. United States*, 24 Cl. Ct. 763, 767 (1991) (observing that FAR 32.610(a) requires "timely assertion of a repayment demand"); *Webster's New World Dic-*

*tionary* 365 (3d ed. 1988) (defining "delay" as "to put off to a future time; postpone"); *id.* at 1535 (defining "without" as "not with; lacking").

The regulatory history of FAR 49.402-6(c) also supports the plain-meaning reading of the regulation and shows that its language was purposefully chosen in order to limit contracting-officer discretion as to when demands for excess reprocurement costs could be issued. FAR 32.610(a) and 49.402-6(c) can both be traced to the original promulgation of the FAR in 1983. *See* 48 Fed. Reg. 42,101, 42,345, 42,460 (Sept. 19, 1983). FAR 49.402-6's language, however, was modeled after an older Department of Defense regulation, 32 C.F.R. § 8.602-6 (1970), which was first promulgated in 1968. *See* 33 Fed. Reg. 7347, 7380 (May 18, 1968). Unlike FAR 49.402-6, the regulation on which it was modeled did not specify when a contracting officer had to issue a demand for excess reprocurement costs, other than to say that it should be done if repurchase was made at a price higher than that in the original contract. *See* 32 C.F.R. § 8.602-6(c) (1970) ("If repurchase is effected at a price in excess of the price of the supplies terminated, the [contracting officer] shall make a written demand on the contractor for the total amount of such excess giving due consideration to any increases or decreases in other ascertainable costs such as transportation, discounts, etc.").

In 1983, the drafters of FAR 49.402-6(c) added the clause "after completion and final payment of the repurchase contract" to further specify when a contracting officer must issue a demand for excess reprocurement costs. *See* FAR 49.402-6(c) ("If repurchase is made at a price over the price of the supplies or services terminated, the contracting officer shall, *after completion and final payment of the repurchase contract*, make a written demand on the contractor for the total amount of the excess, giving consideration to any increases or decreases in other costs such as transportation, discounts, etc.") (emphasis added).

Here, for whatever tactical or other reason it had, the Government refused to do so, even when prompted by GIV's repeated arguments to the Board.

### B. Defendant Waited Seventeen Months After Completion and Final Payment of the Repurchase Contract to Assert Its Demand for Excess Reprocurement Costs

Completion and final payment of the repurchase contract took place no later than June 13, 2005. (Puckett Decl. ¶ 12.) Defendant therefore waited more than seventeen months (and more than two years following its termination of the Fluvirin Contract) to demand excess reprocurement costs from GIV. (*See* Compl. ¶¶ 38-39; Answer ¶¶ 38-39; ASBCA Compl. ¶ 29, App. 138; ASBCA Answer ¶ 29, App. 159.)

### C. GIV Was Prejudiced by Defendant's Persistent Refusal to Issue a Timely Demand for Excess Reprocurement Costs

In proceedings before the Board, GIV made every effort to raise the issue of excess reprocurement costs so that it could be resolved in an efficient manner while the threshold issue of GIV's default termination was also before the Board. Those efforts were thwarted by DSCP's persistent refusal to issue a formal, written demand for excess reprocurement costs, though the amount of the claim it was to make after the Board's termination decision was already known to it.

In Count IV of the Complaint filed with the Board on March 14, 2005, GIV explained that, in a telephone conference on February 10, 2005, DSCP had informed GIV that it intended to seek approximately $2,300,000 in excess reprocurement costs from GIV, which DSCP alleged represented the difference in cost between the Fluvirin and the FluMist ordered from GIV. (ASBCA Compl. ¶ 29, App. 138.) In response, DSCP acknowledged only that "during a February 10, 2005 telecon [sic] DSCP advised [GIV] that the delta between the cost of Fluviron [sic] or-

dered under the Contract and FluMist was approximately $2,300,000." (ASBCA Answer ¶ 29, App. 159.)

Then, on July 8, 2005—twenty-five days after "completion and final payment of the repurchase contract," FAR 49.402-6(c)—DSCP filed a motion for summary judgment in the Board proceeding. In arguing that the Board lacked jurisdiction to decide GIV's challenge to DSCP's ability to demand excess reprocurement costs, DSCP asserted that "there is no Government claim [for excess reprocurement costs] to challenge, as the Government has not yet issued any demand for excess reprocurement costs." (ASBCA DSCP Mot. for Summ. J. at 11, App. 178.)

In response, GIV observed that there was no reason for DSCP to withhold issuance of a formal demand for excess reprocurement costs, explaining:

> This case does not present a situation where the Government cannot yet quantify the amount of its alleged damages, or a situation where the Government is still in the process of rebidding a contract. DoD "reprocured" FluMist® in October 2004, quantified the "delta" between the cost of Fluvirin® under the Contract and the cost of FluMist® it purchased prior to its termination of GIV's Contract, and notified GIV of its claim for reprocurement costs in February [2005].

(ASBCA GIV Cross-Mot. for Summ. J. at 18, App. 199.)

However, on September 13, 2005—more than three months after "completion and final payment of the repurchase contract," FAR 49.402-6(c)—DSCP again represented to the Board that DSCP's claim for excess reprocurement costs had "not matured yet" and that "no Government demand for costs has been issued." (ASBCA DSCP Reply in Supp. of Mot. for Summ. J. at 4, App. 207.)

In sum, GIV's efforts to resolve the issue of excess reprocurement costs in an efficient manner were met with the assertion that no claim had yet been made. The Board eventually agreed with DSCP's ripeness argument, concluding in its August 31, 2006 decision that it would not consider the "propriety of government reprocurement actions" in the absence of a formal,

written demand for excess reprocurement costs. *GIV*, 2006 WL 2589950, at *11. Only after the Board's decision and on the eve of GIV's Federal Circuit appeal deadline did DSCP finally issue a formal, written demand for excess reprocurement costs. Moreover, by its own admission, the formal demand it did issue was overstated by 58 percent. (*See* Answer ¶¶ 70-73.)

* * * * *

"The FAR [is] issued under statutory authority and published in conformance with required statutory and regulatory procedures. . . . Accordingly, [the FAR has] the force and effect of law." *Davies*, 35 Fed. Cl. at 657. The FAR commands that, if the Government wishes to issue a demand for excess reprocurement costs, it must do so "without delay" after "completion and final payment of the repurchase contract." FAR 32.610(a), 49.402-6(c). That it did not do in this case for whatever reasons it had.

The FAR is rendered meaningless if there are not consequences to its being ignored by the agencies charged with following it. Ultimately, it does not matter whether DSCP's failure to issue a timely demand for excess reprocurement cost was merely the result of an administrative oversight—unlikely, given DSCP's repeated acknowledgment of the issue in pleadings before the Board—or part of a deliberate strategy to place settlement pressure on GIV prior to its filing an appeal in the Federal Circuit—certainly there is circumstantial evidence to suggest that this was the case given the timing of DSCP's demand shortly before the deadline for GIV's notice of appeal. The fact remains that Defendant waited more than a year and a half after completion and final payment of the repurchase contract to assert its demand for excess reprocurement costs.

To the extent that GIV must also demonstrate that it was prejudiced by Defendant's persistent refusal to follow the FAR's unambiguous command, GIV has been forced to re-litigate the excess-reprocurement-cost issue before this Court and incur the expense of doing so. DSCP

was able to obtain a decision on liability without the Board being fully aware of the consequences of its decision. Therefore, under the particular circumstances of this case, the Court should hold that Defendant's demand for excess reprocurement costs was untimely and enter judgment in GIV's favor.

## II. DEFENDANT IS NOT ENTITLED TO EXCESS REPROCUREMENT COSTS BECAUSE IT PURCHASED A DISSIMILAR PRODUCT

Excess reprocurement costs may be imposed only when the Government meets its burden of establishing each of the following three elements: "(1) the reprocured supplies are the same as or similar to those involved in the termination; (2) the Government actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs resulting from the default." *Cascade Pac. Int'l v. United States*, 773 F.2d 287, 293-94 (Fed. Cir. 1985) (citations omitted). Because Defendant cannot satisfy the first *Cascade Pacific* element, Defendant's demand for excess reprocurement costs must be rejected in its entirety, even if it is deemed timely.[3]

### A. The Government May Recover Excess Reprocurement Costs Only If the Reprocured Supplies Are Sufficiently Similar to Those for Which the Government Originally Contracted

The first *Cascade Pacific* element asks whether the "reprocured supplies are the same as or similar to those involved in the termination." *Cascade Pacific*, 773 F.2d at 294. The answer to this question is "demonstrated by comparing the item reprocured with the item specified in the original contract." *Id.* (citing *Environmental Tectonics Corp.*, ASBCA No. 21204, 1978 WL 2061). As the Board explained in *Environmental Tectonics*:

[3] By mutual agreement and with the Court's permission, the parties have not yet engaged in formal discovery. Therefore, at this time, GIV lacks sufficient information upon which to evaluate fully whether Defendant can satisfy the second and third *Cascade Pacific* elements. Should the Court deny GIV's motion, the discovery process can be used to determine whether Defendant actually incurred excess costs and acted reasonably to minimize those costs.

> The word "similar" . . . means similar in physical and mechanical characteristics as well as functional purpose. . . . However, it is well settled that the word "similar" need not be treated as meaning "identical." In order to expunge the defaulting contractor's entire liability for excess costs, the differences between the supplies repurchased as contrasted with those specified in the defaulted contract must be substantial and material. . . . Therefore, minor variations or deviations in the repurchase contract do not relieve the defaulted contractor of his liability for excess costs. . . .

1978 WL 2061, at *18 (citations omitted).

Here, the differences between FluMist and Fluvirin (or Fluzone) are not minor variations or deviations; they are significant. The only thing they have in common is that they treat the flu (and even then not for the same age indications).

The similarity requirement is well-established, dating back at least as far as the Supreme Court's decision in *United States v. Axman*, 234 U.S. 36 (1914). In *Axman*, the Government contracted with a construction company to dredge part of a bay. *See id.* at 39. The contract required the company to deposit the dredged material ("spoil") in a certain location. *Id.* The contractor allegedly mistook the nature of the work, and to reduce his costs asked to dump the spoil elsewhere. *Id.* at 40. The Government refused, the contractor failed to perform, and the Government awarded the contract to another company. *Id.* at 40-42. In the new contract, however, the Government gave the contractor the option to deposit spoil in the location that the original contractor had requested. *Id.* at 42.

The new contract cost the Government more money and it sued the original contractor for the price difference. *Id.* In rejecting the Government's claim for excess reprocurement costs in its entirety, the Supreme Court held that the original contract "specifically made the place of dumping the spoil an essential and particular term of the contract." *Id.* at 43. The Court concluded that the "change in the place of dumping the spoil was very material, and could not be made consistently with the terms of the agreement under which [the original contractor] under-

took to perform the work or be liable . . . ." *Id.* at 43-44. As a result, the Court concluded that the Government was not entitled to recover the price difference between the two contracts. *Id.* at 45.

In a case similar to the one at bar, the *Axman* principle was applied by the Court of Claims in *Schwartz v. United States,* 65 F. Supp. 391 (Ct. Cl. 1946). There, the Navy contracted with Schwartz to build an office communications system. Schwartz installed a loudspeaker system that proved to be inadequate. *See id.* at 392. The Navy terminated Schwartz's contract and replaced him with a contractor who installed a different and more expensive telephone-based system. *See id.* The Navy demanded from Schwartz the difference in contract prices. *See id.* Schwartz paid the amount under protest and filed suit against the United States for return of the money. *See id.*

In ordering the Government to return the money, the Court of Claims held that the second system was too different from the first system for the plaintiff to be responsible for the difference in contract price, explaining:

> [The] question is whether, as a matter of law, plaintiff is entitled to recover this amount because the contracting officer, in reletting the contract for an interoffice communication system, materially and substantially departed from the requirements of his contract with plaintiff in this regard. Defendant admits that there was such a material and substantial departure and that there were "[m]aterial and substantial difference[s] between the battery operated equipment purchased from the [second contractor] and the interoffice communication system described in the [contract] specifications and furnished by the plaintiff." In view of these facts it must be held that defendant breached its contract with plaintiff when it relet the contract for an entirely different system and demanded and collected the amount of $1,794.74 . . . as excess cost, occasioned by completion of the original contract.

*Id.* at 393.

*See also Consolidated Airborne Systems, Inc. v. United States*, 348 F.2d 941, 947 (Ct. Cl. 1965) ("Substantial and material differences in the physical characteristics of supplies repurchased, as contrasted with those specified in the defaulted contract, have been repeatedly held to

be such a material deviation as to render the defaulting contractor not liable in accordance with contract terms for excess costs incurred in the repurchase of 'similar' supplies."); *Rosenberg v. United States*, 76 Ct. Cl. 662, 1933 WL 1837, at *9 ("It has long since been held that where the Government by reason of a claimed default in the performance of a contract elects under its terms to relet the contract and charge the increased cost, if any, to the defaulting contractor, such charge may not be sustained if in the reletting there is a material or substantial departure from the original contract terms."); *CJP Contractors, Inc. v. United States*, 45 Fed. Cl. 343, 385 (1999) ("Under the FAR the Government is not entitled to costs arising from 'material changes' in the reprocurement specifications that result in 'substantial alterations' in the work.") (citing *Axman* and *Cascade Pacific*).

The Federal Circuit's most recent discussion of the similarity issue occurred in *Seaboard Lumber Co. v. United States*, 308 F.3d 1283 (Fed. Cir. 2002). In *Seaboard Lumber*, two contractors defaulted on contracts to harvest timber and were later charged for excess costs when the Government awarded contracts to complete the work. *See id.* at 1291. The defaulting contractors argued that the Government's reletting of the contracts under different financial terms absolved them of excess-reprocurement-cost liability under *Axman*. *Id*.

The Court of Appeals rejected that argument, explaining:

> *Axman* and its progeny have a common thread. The cases in which the courts have barred a damage claim under *Axman* involved substantial and material changes in the physical nature of the performance, i.e., the work to be performed or the goods to be delivered, from the original contract to the re-let contract. . . .
>
> In contrast, where the changes in the resale contracts have involved changes in financial terms or only minor changes to performance, rather than substantial changes to the nature of the work performed, our precedent and that of our sister circuits hold that the *Axman* defense is unavailable. . . .

*Id.* (citations omitted). Because the Government had made only minor alterations in the work to be performed under the contracts—the subsequent contracts entered into by the Government

called for the harvesting of the exact same timber, albeit under financial terms that were different in certain, minor respects—the Court of Appeals held that the contractors' *Axman* defense failed as a matter of law. *Id.* at 1329.

### B. There Are Substantial and Material Differences Between Fluvirin and FluMist, and They Are Not Sufficiently Similar To Form the Basis of an Excess-Reprocurement-Cost Claim

In its original contract with GIV, DSCP made clear that it wanted—and GIV agreed to sell—not just any flu virus vaccine, but one with at least two "salient characteristics." First, the vaccine had to be "suitable for subcutaneous or intramuscular administration." (Compl., Ex. 1 at 23, 25, 27.) In other words, the vaccine had to be injectable. Second, the vaccine had to be suitable for persons four years of age or older. (Compl., Ex. 1 at 96.)

Fluvirin met both of these requirements. FluMist did not. FluMist is not an injectable vaccine; rather it is inhaled through the nose. (Compl. ¶ 12; Answer ¶ 12.) In addition, FluMist is a live vaccine that during the 2004-2005 flu season was not suitable for all persons four years of age and older. (Compl. ¶ 12; Answer ¶ 12.) Instead, FluMist was FDA-approved for use only by healthy persons aged five to forty-nine. (Puckett Decl. ¶ 11.) FluMist, therefore, could not have been substituted under the Fluvirin Contract.

Because of its different characteristics, indications, and storage requirements, FluMist is also much more expensive than Fluvirin. During the 2004-2005 flu season, one package of 10 single-dose FluMist single-use sprayers ($104.79) cost approximately 66 percent more than one 10-dose vial of injectable Fluvirin ($63.31). (*See* Compl., Ex. 1 at 96.) Several factors accounted for the significant price difference between Fluvirin and FluMist, the latter of which was an extremely new product that had been on the market for approximately one year. (Puckett Decl. ¶ 7.)

First, unlike Fluvirin, FluMist required special handling procedures because it had to be stored and shipped in a frost-free frozen state. (*Id.* ¶ 8.)

Second, the processing of FluMist orders was much more complicated than orders for Fluvirin. (*Id.* ¶ 9.) For example, prior to the customer receiving a shipment of FluMist, GIV had to make sure that the customer also received specially designed freeze boxes to store the product and to make sure that the customer clearly understood the type of freezer and the amount of freezer space that would be required for storing FluMist. (*Id.*) GIV then had to notify the customer prior to the arrival date of the shipment to ensure that the freeze box had been conditioned by being frozen at least four days before the FluMist's arrival. (*Id.*)

* * * * *

The question of similarity does not ask only whether the products at issue serve a similar purpose. For example, Defendant's Answer asserts that "[b]oth FluZone and FluMist are similar to Fluvirin in that all three products are vaccines against influenza." (Answer ¶ 62.) While that may be true to a certain extent, this statement reflects a misunderstanding of the degree of similarity required by cases such as *Axman* and *Schwartz*. In acquiring the much more expensive FluMist, DSCP made substantial and material changes in the physical characteristics of the supplies purchased, as contrasted with those specified in the defaulted contract.

Under these circumstances, Defendant is not entitled to excess reprocurement costs as a matter of law.

## III. DEFENDANT CANNOT RECOVER EXCESS REPROCUREMENT COSTS FOR VACCINE PURCHASED OVER ONE MONTH BEFORE GIV'S CONTRACT TERMINATION

In relevant part, the FAR provides that "[w]hen the supplies or services are still required *after* termination, the contracting officer shall repurchase the same or similar supplies or services

against the contractor's account as soon as practicable." FAR 49.402-6(a) (emphasis added); *see also* FAR 12.403(c)(2) (explaining that the "Government's rights *after* a termination for cause shall include" acquiring "similar items from another contractor and to charge the defaulted contractor with any excess reprocurement costs") (emphasis added).

The pleadings here establish that more than one month *before* terminating the Fluvirin Contract, DSCP purchased 25,000 of the 58,795 packages of 10 single-dose, single-use FluMist sprayers on which Defendant's current demand for excess reprocurement costs is based. (*Compare* Compl. ¶¶ 12, 20, *with* Answer ¶¶ 12, 20, 60, 65.) As a matter of law, however, DSCP's "right" to procure "similar" items did not accrue until after the Contracting Officer terminated the Fluvirin Contract for cause. As set forth above (at 13), the FAR has the force of law and should be applied according to its plain terms.

Defendant therefore should not be allowed to recover excess reprocurement costs related to its October 7, 2004 purchase of 25,000 FluMist packages, particularly where, as here, it did not even state at the time of the purchase that it intended the FluMist purchase to constitute a replacement for the Fluvirin it had already contracted to buy.[4]

## CONCLUSION

Based on the foregoing, the Court should grant GIV's motion and enter judgment in its favor. First, under the plain language of the FAR, Defendant's demand for excess reprocurement

[4] Research indicates that neither this Court nor the Federal Circuit have addressed the legal question of whether the Government may demand excess reprocurement costs for purchases made prior to contract termination. Federal boards of contract appeals have reached conflicting judgments on that issue. *See Rose Printing, Inc.*, GPOBCA No. 32-95, 1996 WL 812880, at *20-21 (surveying prior board decisions). GIV respectfully submits that board decisions suggesting that such demands are allowed cannot be squared with the plain and unambiguous language of FAR 49.402-6(a). *See id.* at *20 (noting that language of standard contract provision nearly identical to FAR 49.402-6(a) counseled in favor of disallowing such demands).

costs was untimely. Second, even if Defendant's demand for excess reprocurement costs were somehow deemed timely, GIV is still entitled to judgment as a matter of law because Defendant purchased an inhalable type of vaccine that was not substantially similar to the considerably less expensive injectable type for which it had originally contracted. Third, at the very least, Defendant's demand for excess reprocurement costs related to its purchase of vaccine more than one month before it terminated the Fluvirin Contract should be rejected based on the plain language of the FAR.

Dated: August 20, 2008

Respectfully submitted,

s/Bruce E. Fader by s/James F. Segroves
Bruce E. Fader
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036-8299
212.969.3415
212.969.2900 (fax)
bfader@proskauer.com

*Attorney of Record for Plaintiff*
*General Injectables & Vaccines, Inc.*

*Of Counsel*:
James F. Segroves
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533
202.416.6871
202.416.6899 (fax)
jsegroves@proskauer.com