PROSKAUER ROSE LLP

1233 Twentieth Street NW, Suite 800
Washington DC 20036-2396
Telephone 202.416.6800
Fax 202.416.6899

NEW YORK
LOS ANGELES
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

**Joseph E. Casson**
Partner

Direct Dial 202.778.1111
jcasson@proskauer.com

March 14, 2005

Recorder
Armed Services Board of Contract Appeals
Skyline Six, Room 703
5109 Leesburg Pike
Falls Church, Virginia 22041-3208

Re: ASBCA No. 54930
Appeal of General Injectables & Vaccines, Inc.
Under Contract No. SP-0200-04-D-0003

COMPLAINT

Appellant General Injectables & Vaccines, Inc. submits this Complaint challenging the November 15, 2004 decision of the Department of Defense contracting officer to terminate Contract No. SP-0200-04D-0003 for cause and seek excess reprocurement costs from General Injectables & Vaccines, Inc.

**PARTIES**

1. Appellant General Injectables & Vaccines, Inc. ("GIV") is incorporated in the Commonwealth of Virginia and maintains its principal place of business in the Commonwealth of Virginia. GIV is a licensed wholesale distributor of pharmaceuticals and supplies, including Fluvirin® flu vaccine.

2. Respondent Department of Defense ("DoD") is the federal agency that awarded Defense Contract No. SP0200-04D-0003 (the "Contract") to GIV, and the federal agency that notified GIV of its final decision to terminate the Contract for cause and seek reprocurement costs. The Contract may be found at Tab 1 of the Rule 4 File submitted by the DoD to this Board on March 4, 2005. The final decision of DoD may be found at Tab 15 of the Rule 4 File submitted by the DoD to this Board on March 4, 2005.

**JURISDICTION**

3. The jurisdiction of the Board to consider this Complaint is founded upon the Disputes provision of the Contract, and the Contract Disputes Act of 1978, 41 U.S.C. §§ 601-603.

**FACTUAL BACKGROUND**

4. On January 14, 2004, DoD issued Solicitation No. SP0200-04R-0005 requesting a bid from GIV to deliver Fluvirin® injectable flu vaccine to DoD employees for the 2004-2005 flu season. See generally Solicitation No. SP0200-04R-0005, Tab 1 of the Rule 4 File.

5. GIV responded to the Solicitation on February 13, 2004 In its response, GIV disclosed that GIV was not the manufacturer of Fluvirin®, but rather was the licensed wholesale distributor of the flu vaccine. GIV disclosed in its response to the Solicitation that Fluvirin® was manufactured by Chiron Vaccines ("Chiron") in Liverpool, England. See Contract at pages

15-16 of 50, Tab 1 of the Rule 4 File; also Contract-Addendum, Past Performance, last page of Tab 1 of the Rule 4 File.

6. In its response to the Solicitation, GIV notified DoD that a request for a waiver of the requirements to submit a Small Business Subcontracting Plan was pending with the Veterans Administration procurement officer. See Contract at page 18 of 50, Tab 1 of the Rule 4 File. On or about April 15, 2004, GIV again requested that DoD waive the requirement in the Solicitation that GIV submit a Small Business Subcontracting Plan as a condition of eligibility for being awarded the delivery contract for Fluvirin®. GIV did not submit a Small Business Subcontracting Plan to DoD as part of its response to the Solicitation or at any other time.

7. On April 21, 2004, DoD awarded GIV the Contract to deliver Fluvirin® to DoD employees. See Contract No. SP0200-04D-0003 between DoD and GIV of 4/21/04, Tab 8 of the Rule 4 File.

8. On the same day as the award, on April 21, 2004, DoD issued Delivery Order No. SP0200-04D-003-8001, requesting delivery of 226,846 Vials of Fluvirin® and 17,460 Packages of Syringe Units. Delivery Order No. SP0200-04D-0003-8001 from DoD to GIV of 4/21/04, at 2 of 3, Tab 8 of the Rule 4 File. Under the terms of the Delivery Order and the Contract, DoD requested delivery of 25% of the ordered quantity by no later than September 30, 2004, 25% of the ordered quantity by no later than October 31, 2004, and 50% of the ordered quantity by no later than November 30, 2004. Id.

9. On or about August 25, 2004, Chiron notified the United States Food and Drug Administration ("FDA") that it had discovered accidental bacterial contamination in eight lots of final vaccine produced for the 2004/2005 flu season, and advised the FDA that it (Chiron) could not release any flu vaccine for importation to the United States until both British and United States authorities affirmatively deemed its product safe and saleable. Neither Chiron nor the FDA notified GIV that Fluvirin® was not presently available for importation to the United States.

10. On September 28, 2004, Chiron's Chief Executive Officer Howard Pien publicly testified before the United States Senate Special Committee on Aging that Chiron expected to release between 46 million and 48 million doses of Fluvirin® to the United States beginning in early October. Press Release, Chiron Corporate Communications & Investor Relations, Chiron to Testify Today to the Value of Influenza Vaccination Before U.S. Senate Special Committee on Aging (Sept. 28, 2004), available at http://www.chiron.com.

11. Between September 28, 2004 and September 30, 2004, the Medicines and Healthcare Products Regulatory Agency ("MHRA"), the British equivalent of the FDA, conducted an inspection of Chiron's Liverpool manufacturing facility. The MHRA did not notify the FDA or GIV of its inspection, nor did Chiron notify GIV of the MHRA inspection or otherwise provide GIV with any notice that it (Chiron) might be unable to release Fluvirin® to its distributors by September 30, 2004 for sale in the United States. Press Release, Chiron Corporate Communications & Investor Relations, Chiron Will Not Supply Fluvirin Influenza

Virus Vaccine for 2004-2005 Influenza Season (Oct. 5, 2004), available at http://www.chiron.com.

12. On October 5, 2004, following an inspection lasting from September 28 to September 30, 2004 , the MHRA suspended Chiron's license to operate for three months. Id.

13. Between October 10 and October 15, 2004, the FDA conducted its own inspection of the Chiron Fluvirin® manufacturing facility in Liverpool, England, and on October 15, 2004, the FDA embargoed all shipments of Chiron-manufactured Fluvirin® to the United States.

14. As a result of the suspension of Chiron's operating license by the British MHRA, and the embargo of shipment to the United States of Chiron-manufactured Fluvirin® by the FDA, in October 2004, the FDA determined that none of the Fluvirin® already in the U.S. could be used in this country because of safety concerns.

15. Therefore, GIV continued to quarantine all undistributed Fluvirin® it had already received from Chiron, and cooperated with Chiron to ultimately destroy all Fluvirin® the FDA would not release. See generally email from Anna Podlas, DoD to Steven Bollendorf, DoD, dated July 7, 2004, Tab 10 to the Rule 4 File ("GIV anticipates receiving a delivery schedule from Chiron the end of this week. The first shipment (quantity not certain yet) is anticipated in August.").

16. As a result of the determination by the FDA that none of the Chiron-manufactured Fluvirin® could be safely released for use in the U.S., a "flu shortage" ensued because the only

other manufacturer of injectable flu vaccine, Aventis, could not manufacture sufficient quantities of its injectable flu vaccine, Fluzone®, in time for use for the 2004-2005 flu season.

17. In order to best coordinate the distribution of all available Fluzone® injectable flu vaccine, the CDC developed a list of priority groups, and communicated the priority list to the general public. The vaccination priority groups included children under the age of 2, persons over the age of 65, pregnant women, persons who live in nursing homes, and persons between 2 and 64 years of age with a chronic medical condition, such as diabetes, cardiac or respiratory disease, or immune disorder. Id. Most active duty military personnel did not qualify to receive injectable flu vaccine under the CDC's priority list. Eligible Groups for Inactivated Influenza Vaccine, published by the Advisory Committee on Immunization Practices, available at http://www.cdc.gov/nip/vfc/acip_resolutions/1004-1flu.pdf; also Statement of Jesse Goodman, M.D., M.P.H, Director, Center for Biologics Evaluation and Research, Food and Drug Administration, before the Committee on Government Reform, February 10, 2005, available at http://www.fda.gov/ola/2005/influenza0210.html.

18. In response to the flu vaccine shortage, the CDC highly recommended that distributors that did have Fluzone® available deliver their available product only to health care professionals serving individuals included in certain priority groups as identified by the CDC. Press Release, Centers for Disease Control, CDC and States Announce Plan to Distribute 10.3 Million Flu Shots Nationwide; Public Health Officials Call Allocation Fair and Aimed at Most Vulnerable Americans, (Nov. 9, 2004), available at http://www.cdc.gov.

19. The CDC strongly urged all entities in possession of Fluzone® in October 2004 to release their inventory of vaccine only to persons on the priority list. GIV complied with the CDC priority list directive and periodically updated the CDC of its distribution plans. The CDC, HHS and the states directed the distribution of Fluzone® that became available after October 5, 2004 (the "supplemental injectable flu vaccine supply") only to end users on the high priority list.

20. On or about October 28, 2004, the Secretary of the Department of Health and Human Services ordered the DoD to substitute FluMist® in its pending flu vaccine orders so as to free up approximately 200,000 doses of the only available injectable flu vaccine (Fluzone®) for the priority populations who cannot take FluMist®. HHS News Release dated October 28, 2004, available at http://www.hhs.gov/news/press/2004pres/20041028a.html.

21. On October 12, 2004, GIV notified DoD via facsimile and U.S. mail that it would be unable to deliver Fluvirin® on the schedule contemplated under the Contract because the manufacturer of the product, Chiron, was unable to release any Fluvirin® due to the MHRA administrative suspension, as well as the FDA embargo. See Tab 13 of the Rule 4 File.

22. In the same notice letter, on October 12, 2004, GIV notified DoD via facsimile and U.S. mail that it was making good faith efforts to identify alternative sources of supply of injectable flu vaccine in order to satisfy all or part of the Delivery Order, but was not optimistic that such supplies existed. See Tab 13 of the Rule 4 File.

23. GIV was not aware of the HHS mandate that the DoD only use FluMist® at the time it notified the DoD that it would make good faith efforts to obtain injectable flu vaccine at the time it sent the October 12, 2004 notice letter to DoD.

24. On October 7, 2004, five days before GIV's notification to DoD of its inability to perform under the Contract, DoD placed an order for FluMist®. DoD claims that it placed the order for FluMist® after reading Chiron's October 5, 2004 Press Release. See Final Decision at paragraph 4, Tab 14 of the Rule 4 File.

25. Subsequent to GIV's notification to DoD on October 12, 2004, the CDC and the states acted to coordinate the distribution of all the supplemental injectable flu vaccine supply in the United States and required that any available supplemental injectable flu vaccine be distributed only to individuals on the CDC's high risk priority list. As a direct result of the actions of CDC and the states, GIV was prevented from delivering to the DoD any supplemental injectable flu vaccine it may have been able to obtain from sources other than Chiron.

26. On November 15, 2004, DoD issued a final decision of its contracting officer to GIV terminating the Contract for cause, claiming that GIV failed to make timely delivery under the Contract and that the failure to deliver was not due to excusable causes. Termination Letter from DoD to GIV of 11/15/04, at 1, Tab 15 of the Rule 4 File.

27. The November 15, 2004 final decision also indicated that DoD intended to seek costs of reprocurement as a result of the termination action. Id. at 4. The November 15, 2004

final decision did not identify the amount of the costs DoD was claiming against GIV, nor did the final decision identify the basis for DoD's claim for reprocurement costs.

28. In telephone conferences on February 8 and 10, 2005, DoD informed GIV that it would be willing to accept FluMist® nasal spray as an alternative to Fluvirin®.

29. In a telephone conference on February 10, 2005, DoD informed GIV that it is seeking approximately $2,300,000 in excess reprocurement costs from GIV, which the DoD alleges represents the difference in cost between the Fluvirin® ordered under the Contract, which is not available from any source, and FluMist®.

30. GIV filed a timely request for a hearing on February 10, 2005 to dispute DoD's termination and reprocurement action.

## OBJECTIONS TO DoD'S NOTICE OF TERMINATION FOR CAUSE AND CLAIM FOR REPROCUREMENT COSTS

31. The Government bears the burden of proving that termination for cause is justified. Double B Enter., Inc., ASBCA Nos. 52010, 52192, 2001-1 BCA (CCH) ¶ 31,396 (April 24, 2001) (citing Lisbon Contractors, Inc. v. U.S., 828 F.2d 759, 763-65 (Fed. Cir. 1987). The Board may set aside the DoD's decision to terminate GIV's contract for cause where it finds the DoD's decision was contrary to law, "arbitrary and capricious, or that it represents an abuse of...discretion." Quality Env't Sys, Inc., ASBCA No. 22178, 87-3 BCA ¶ 20,060 at 101,569, aff'd by Quality Env't Sys, Inc. v. U.S., 7 Cl. Ct. 428, 32 Cont. Cas. Fed. (CCH) ¶ 73267 (1985).

32. Here, the Board must set aside the DoD's decision to terminate for cause as arbitrary and capricious because (1) GIV did not default under terms of the Contract; or, alternatively, (2) GIV's duty to perform has been discharged under federal regulations that waive liability for GIV even if there is a default. Finally, the Board must set aside DoD's notice of intent to assess reprocurement costs as arbitrary and capricious because (1) DoD has not demonstrated that it incurred reprocurement costs, (2) DoD has not demonstrated that it procured a substantially similar product to Fluvirin®, and (3) DoD has not demonstrated that it acted reasonably to mitigate any costs it may have incurred to purchase flu vaccine.

**COUNT I. GIV DID NOT DEFAULT UNDER THE TERMS OF THE CONTRACT BECAUSE THE CONDITION PRECEDENT TO GIV'S PERFORMANCE WAS NOT MET**

33. GIV incorporates by reference each and every allegation set forth in paragraphs 1 through 32 above.

34. The intention of the parties to a contract is gleaned from all of the contract clauses interpreted as a whole, i.e., from the four corners of the document. Double B Enter., Inc., ASBCA Nos. 52010, 52192, 2001-1 BCA (CCH) ¶ 31,396 (April 24,2001) (quoting The City of New York v. U.S., 113 F. Supp. 645, 647 (Ct. Cl. 1953)). If the terms of a contract document are unambiguous, then the Board's inquiry is at an end. Serralles v. U.S., 46 Fed. Cl. 773, 782 (Fed. Cl. 2000).

35. The Contract between GIV and the DoD was a delivery contract that contemplated that GIV would deliver to the DoD Fluvirin® manufactured by Chiron and

imported by GIV. See Contract at page 4 of 50 ("May have to alter delivery schedule outlined in bid due to releases of vaccine."); pages 15-16 of 50 (active ingredients manufactured by Chiron, ingredients will be weighed, measured, mixed and compounded by Chiron, product will be sterilized by Chiron, immediate container will be filled and labeled by Chiron; material will be packed and prepared for shipment by GIV), Tab 1 of Rule 4 File.

36. DoD awarded the Contract for injectable flu vaccine to GIV with full knowledge that GIV was not the manufacturer of the product under contract. Pages 15-16 of 50 (active ingredients manufactured by Chiron, ingredients will be weighed, measured, mixed and compounded by Chiron, product will be sterilized by Chiron, immediate container will be filled and labeled by Chiron; material will be packed and prepared for shipment by GIV), Tab 1 of Rule 4 File; also Contract Addendum, Past Performance, last page of Tab 1 of the Rule 4 File (documenting that GIV contracted with DoD for 2003-2004 flu season for the distribution of Fluvirin®); Award Document dated April 21, 2004, page 3 of 3, Tab 8 of Rule 4 File.

37. DoD was aware at the time it signed the Contract with GIV that the DoD was contracting only for delivery services from GIV. Id.

38. DoD awarded the Contract to GIV with full knowledge that Chiron's shipment and FDA's release of saleable product to the United States was a condition precedent to GIV's obligation to deliver flu vaccine under the express terms of the Contract. See Contract at page 4 of 50, Tab 1 of Rule 4 File; Amendment 00003 to Contract at page 2 of 7, Tab 4 of Rule 4 File; Amendment 00003 to Contract, page 8 of 50, Tab 4 of Rule 4 File; GIV's Final Proposal

Revision dated April 1, 2004 at page 2 of 2, Tab 6 of Rule 4 File; Amendments 3 and 4 to Contract regarding delivery schedule dated April 15, 2003 [sic], Tab 7 of Rule 4 File; Contract Award dated April 21, 2004, pages 2 and 3 of 3, Tab 8 of Rule 4 File; Delivery Order 800101 dated October 1, 2004, page 5 of 5, Tab 9 of Rule 4 File.

39. DoD issued Delivery Order No. SP0200-04D-0003-8001 to GIV with knowledge at the time the Delivery Order was issued that GIV's performance under the contract was subject to the condition precedent that "Dependent upon FDA release of vaccine, delivery will be as follows….." Delivery Order No. SP0200-04D-0003-8001 Continuation Sheet from DoD to GIV of 10/1/04 at 5 of 5, Tab 9 of Rule 4 File.

40. DoD issued the Delivery Order with knowledge at the time the Delivery Order was issued that delivery by GIV by the dates indicated on the Delivery Order was "dependent upon product availability." Id.

41. GIV's dependence upon Chiron's shipment and the FDA's release of the contracted-for flu vaccine was identified on the Solicitation at the time it was presented to DoD, and DoD accepted the contract subject to the condition precedent, as demonstrated by GIV's inclusion of notice that the company "may have to alter delivery schedule outlined in bid due to releases of vaccine." Solicitation No. SP0200-04R-0005 response from GIV to DoD of 2/13/04 at 4 of 50, Tab 1 of Rule 4 File.

42. Under the terms of the contract, GIV had no obligation to perform until the condition precedent was satisfied; specifically, that Chiron ship flu vaccine for sale in the U.S., and that the FDA certify that Chiron's flu vaccine was safe and release it for sale in the U.S.

43. Because the FDA never released Fluvirin® for import to the United States or sale by GIV, the condition precedent required to trigger GIV's obligation to deliver Fluvirin® to the DoD was never satisfied.

44. Because the condition precedent required to trigger GIV's obligation to perform under the Contract was never satisfied, as a matter of law, GIV was not in default under the Contract for failing to deliver Fluvirin® to the DoD by November 15, 2004, the date on which DoD issued its final determination to terminate the Contract for cause.

**COUNT II. GIV'S DUTY TO DELIVER FLUVIRIN® WAS EXCUSED BY OPERATION OF LAW**

45. GIV incorporates by reference each and every allegation set forth in paragraphs 1 through 44 above.

46. A contractor, such as GIV, is not liable for default if nonperformance is caused by an occurrence beyond the reasonable control of the Contractor and without its fault or negligence. FAR 52.212-4(f) (incorporated by reference into Contract via Solicitation No.

SP0200-04R-0005 of 2/13/04, at 9 of 50); 4J Tech., Inc., ASBCA No. 42194, 92-3 BCA ¶ 25,209.[1]

47. By law, a delivery agent, such as GIV, is not liable for default if delivery is impossible or impracticable because of (1) acts of God or of the public enemy, (2) acts of the Government in either its sovereign or contractual capacity, (3) fires, (4) floods, (5) epidemics, (6) quarantine restrictions (7) strikes, (8) freight embargoes, and (9) unusually severe weather. Id.

48. In this case, GIV could not legally obtain flu vaccine from the manufacturer (Chiron) because of an act by the U.S. government in its sovereign capacity, because of quarantine restrictions, and because of freight embargoes.

A. The Inability to Deliver Fluvirin® To The DoD Was Caused By Events And Reasons Beyond GIV's Control

49. On October 5, 2004, the British equivalent of the FDA (the "MHRA") undertook an administrative action to suspend Chiron's license to manufacture flu vaccine for three months based on routine inspections of the manufacturing plant and process. This act of the British government in its sovereign capacity (the suspension of Chiron's manufacturing license) negatively impacted Chiron's ability to ship flu vaccine in October 2004, as well as beyond that date because the manufacturing process requires incubation periods that were disrupted by the October 5 suspension action.

[1] A date was not provided for this ASBCA case.

50. Following MHRA's October 5, 2004 suspension of Chiron's operating license, the FDA conducted its own inspection of the Chiron facility between October 10 and October 15, 2004, and ultimately decided on October 15, 2004 that it could not adequately assure that any of Chiron's already produced flu vaccine met U.S. safety standards. As a result of this determination, the FDA acted in its sovereign capacity to embargo all shipments of Chiron flu vaccine to the United States. This embargo action acted as an effective quarantine of the product.

51. GIV does not own Chiron, and is not related to Chiron in any way. See Solicitation No. SP0200-04R-0005 of 2/13/04, at 40 of 50, Tab 1 of Rule 4 File.

52. GIV is a wholesale distributor of flu vaccine which it purchases from the manufacturer, Chiron.

53. GIV has no control over the manufacturing process at Chiron.

54. GIV has no control over whether the British MHRA or the FDA will approve the release of flu vaccine for purchase by GIV or any other distributor or end user.

55. GIV's inability to deliver Fluvirin® to the DoD was due to acts of government intervention, i.e., the FDA refusal to permit the release of Fluvirin® from the Chiron manufacturing plant in Liverpool, the FDA embargo of Fluvirin® from Great Britain, the act of the FDA to prohibit the distribution of Fluvirin®, and the acts of the CDC, HHS and the states to

control the distribution of the only other substantially similar injectable flu vaccine available in the United States for distribution only to individuals on a government approved priority list.

56. GIV's inability to perform under the Contract as a delivery agent to the DoD of Fluvirin® was excusable because the inability was due to reasons beyond the control and without the fault or negligence of GIV. See, e.g., Consol. Molded Prod., Inc. v. U.S., 600 F.2d 793 (Ct. Cl. 1979) (excusable default when materials were unavailable due to Arab Oil Embargo).

57. Performance under the Contract as agreed was made impracticable by the occurrence of a contingency, the non-occurrence of which was a basic assumption on which the Contract was made, or by compliance in good faith with any applicable foreign or domestic governmental regulation or order, whether or not it later proves to be invalid.

58. Thus, by operation of law, GIV's inability to deliver Fluvirin® to the DoD was due to events and reasons beyond the control of GIV, and thus GIV has no liability to the DoD under the Contract.

B. The Inability To Deliver Fluvirin To The DoD Was Not Due To GIV's Negligence

59. By the express terms of the Contract, GIV's only obligations were to deliver specified quantities of injectable flu vaccine manufactured by Chiron to locations identified by DoD in authorized purchase orders, and to place a DCSP provided TT4 temperature monitor in each of the direct delivery shipments. Contract at pages 23-28 of 50, Tab 1 of Rule 4 File.

60. The terms of the Contract and the Delivery Orders transfer the risk to the DoD that flu vaccine may not be available from Chiron. See, e.g., Delivery Order No. SP0200-04D-0003-8001 Continuation Sheet from DoD to GIV of 10/1/04 at 5 of 5, Tab 9 of Rule 4 File ("Dependent upon FDA release of vaccine, delivery will be as follows….."), (delivery was "dependent upon product availability.").

61. GIV was not negligent in its performance of any of its obligations under the Contract, i.e., GIV did not act or fail to act in any manner, directly or indirectly, that caused Chiron to be unable to ship or the FDA to refuse to release Fluvirin® to the U.S.

62. Thus, by operation of law, GIV's inability to deliver Fluvirin® to the DoD was not due to GIV's negligence, and thus GIV has no liability to the DoD under the Contract.

C. Acts of the United States In Its Sovereign Capacity Made GIV's Ability to Deliver Fluvirin To The DoD Impossible

63. GIV's inability to deliver Fluvirin® to the DoD was due to acts of government intervention.

64. In October 2004, the FDA refused to permit the release of Fluvirin® from the Chiron manufacturing plant in Liverpool.

65. In October 2004, the FDA embargoed the importation of Fluvirin® from Great Britain.

66. In October 2004, agencies of the U.S. government took effective control over all injectable flu vaccine available in the United States, to prevent its distribution to end users who were not on a government approved priority list (children, seniors, individuals with chronic illnesses). Members of the armed forces are likely not individuals on the government's flu vaccine priority list.

67. In October 2004, HHS mandated that the DoD use FluMist® rather than Fluvirin® in order to ensure that individuals on the CDC's priority list could receive injectable flu vaccine immunizations.

68. The Contract terms put DoD on notice that GIV's ability to perform its delivery obligations were dependent on the conditions precedent that the FDA release Fluvirin® for importation to the US and that the flu vaccine be available for distribution to the DoD.

69. Thus, by operation of law, GIV's inability to deliver Fluvirin® to the DoD was due to acts of the U.S. government in its sovereign capacity, and thus GIV has no liability to the DoD under the Contract.

**COUNT III. GIV HAS NO LIABILITY FOR CHIRON'S INABILITY TO SHIP FLUVIRIN® FOR SALE TO THE UNITED STATES**

70. GIV incorporates by reference each and every allegation set forth in paragraphs 1 through 69 above.

71. GIV's obligations under the Contract were to deliver specified quantities of Fluvirin® to the DoD. GIV had no manufacturing or exporting obligations to the DoD under the Contract.

72. During the award process, GIV requested a waiver from the requirement to submit a Small Business Subcontracting Plan to the DoD. GIV's letter requesting a waiver expressly notified the DoD that it would be impracticable to subcontract out any part of the importation or delivery of Fluvirin® to ultimate purchasers, such as the DoD.

73. GIV expressly identified to the DoD in its request for a waiver that the only services that GIV might possibly subcontract under the Contract would be cross-country trucking or other transportation services.

74. Following GIV's notification that it would not perform any of its obligations (except for possibly cross-country trucking or other transportation services) under the Contract through the use of subcontractors, the DoD awarded the Contract to GIV.

75. As GIV's obligations under the Contract were solely to deliver Fluvirin® to the DoD, and DoD was on notice that GIV intended to perform the Contract without the use of subcontractors to deliver the injectable flu vaccine to the DoD, Chiron, as the manufacturer of the injectable flu vaccine, was not, as a matter of law and fact, a subcontractor of GIV under the Contract.

76. GIV's inability to deliver Fluvirin® under the Contract arose from causes beyond the control of GIV, and without the fault or negligence of GIV.

77. GIV's inability to deliver Fluvirin® under the Contract was not due to fault or negligence of any subcontractor.

78. GIV had no knowledge or control over Chiron's actions in the manufacture of Fluvirin®; thus, it cannot be held accountable for Chiron's actions. See, e.g., Transfair Intern'l, Inc. v. U.S., 54 Fed. Cl. 78 (Fed. Cl. 2002) (contractor's knowledge or involvement with subcontractor relevant to determination of excusable default).

COUNT IV. GIV IS NOT LIABLE FOR EXCESS REPROCUREMENT COSTS

79. GIV incorporates by reference each and every allegation set forth in paragraphs 1 through 78 above.

80. In order to recover excess reprocurement costs, the DoD must establish that: (1) the reprocured supplies are the same as, or similar to those involved in the terminated contract; (2) the DoD actually incurred excess costs; and (3) the Government acted reasonably to minimize the excess costs. Cascade Pacific Int'l v. U.S., 773 F.2d 287, 294 (Fed. Cir. 1985); see also WEDJ, Inc., ASBCA No. 27067, 86-3 BCA (CCH) ¶ 19,169 at 96,906.[2] GIV should not be assessed reprocurement costs because DoD did not satisfy the aforementioned conditions.

---

[2] A date was not provided for this ASBCA case.

A. FluMist® Is Not A Legally Acceptable Substitute For Fluvirin® Under The Contract

81. DoD has indicated that it believes it is entitled to the difference between its present acquisition costs of FluMist® as compared to the costs of Fluvirin® under the Contract. "While the Government does not have to prove that the reprocured items and the original items are identical in order to satisfy the requirement for similarity, it must show that the items have similar physical and mechanical characteristics and that they serve the same functional purpose. If the Government fails to prove that the items are similar, it loses its right to excess costs." See Advance Bldg. Maint. Co., ASBCA Nos. 27183, 28219, 85-2 BCA ¶ 18,076 at 90,750; see also Barrett Ref. Corp., ASBCA Nos. 36590, 37093, 91-1 BCA ¶ 23,566 at 118,145, *aff'd.*, 937 F.2d 623 (Fed. Cir. 1991) (table).

82. FluMist® does not have the same, or sufficiently similar, characteristics to Fluvirin® for this product to be considered a reasonable reprocurement alternative to Fluvirin® for purposes of imposing costs on GIV under the contract.

83. GIV could not have substituted FluMist® for Fluvirin® under the terms of the Contract without being in default of the Contract.

84. DoD contracted with GIV to deliver vials of split or purified surface antigen flu vaccine and syringes so as to provide immunization to individuals via a "flu shot." FluMist® delivers flu vaccine via a nasal spray.

85. FluMist® is approved for use only among healthy persons five to 49 years of age; Fluvirin® is approved for use by persons who are at least six months of age, including those who are healthy and those with chronic medical conditions.

86. FluMist® is a live attenuated vaccine, still capable of replication. Fluvirin® is an inactivated (dead), purified surface antigen vaccine.

87. Because FluMist® contains live virus, it must be stored at or below 5°F. It must be maintained continuously between manufacture and administration to an end user in a special non-frost-free freezer. FluMist® is so sensitive that storage in a frost-freezer subjects the product to instability due to the normal temperature cycle of the freezer. It may be thawed in a refrigerator and stored at 36-46°F for no more than 60 hours prior to use.

88. Fluvirin® does not require the special storage requirements that FluMist® does because the virus in Fluvirin® is inactivated.

89. Because of the substantial differences in the mode of delivery of the vaccine, the differences in the target population for whom the different vaccines may be safely used, and the storage requirements, there are substantial cost differences between Fluvirin® and FluMist®.

90. Because of the substantial differences between Fluvirin® and FluMist®, it is not legally permissible for the DoD to charge GIV with the costs of purchasing FluMist®.

B. DoD Did Not Act Reasonably To Minimize Costs Associated With The Unavailability of Fluvirin®

91. A sister agency of the DoD – the CDC – had effective control over the distribution of injectable flu vaccine prior to the date of the DoD's final determination that GIV was in default of the Contract.

92. On information and belief, the DoD never requested that the CDC release flu vaccine for delivery to the DoD. On information and belief, the CDC never waived the requirement that flu vaccine only be made available to individuals on the high priority list to permit members of the military to receive flu vaccine.

93. A sister agency of the DoD – HHS – prohibited the DoD from distributing injectable flu vaccine to members of the military, and mandated that the DoD use only FluMist® for active duty military.

94. Thus, even if GIV had delivered Fluvirin® to the DoD under the terms of the Contract, the DoD was not permitted to distribute injectable flu vaccine to members of the military. The DoD was required to purchase FluMist® by HHS in order to ensure that injectable flu vaccine was available to persons who qualified for injectable flu vaccine on the CDC high priority list.

95. Thus, the DoD's purchase of FluMist® *prior to the notice by GIV on October 12, 2004 of its anticipated inability to deliver Fluvirin®* was due to intervention by CDC and HHS, rather than GIV's actions or inactions.

96. Because the DoD has not purchased a substantially similar product to Fluvirin®, and failed to mitigate its costs of reprocurement, the DoD may not, therefore, seek reprocurement costs from GIV.

**PRAYER FOR RELIEF**

WHEREFORE, GIV demands the following relief against the DoD:

1. a reversal of the Final Decision of the DoD terminating the Contract for cause;

2. a conversion of the Termination For Cause to a Termination for the Convenience of the Government;

3. a denial of the DoD's claim for excess procurement costs; and

4. an Order awarding GIV its costs of suit, and such other and further relief as the Board finds is just and proper, including such relief as may be afforded by the Equal Access to Justice Act 5 U.S.C. § 504, as amended.

Respectfully submitted,

Joseph E. Casson
Susan A. Turner
PROSKAUER ROSE LLP
1233 20th Street, NW, Suite 800
Washington, DC 20036
202-778-1111

Attorneys for General Injectables & Vaccines, Inc.

cc: w/enc to: Kathleen D. Hallam
Chief Trial Attorney
Defense Supply Center Philadelphia
700 Robbins Avenue, Bldg. 36/1
Philadelphia, PA 91111-5092
215-737-2647