PROSKAUER ROSE LLP

1233 Twentieth Street NW, Suite 800
Washington DC 20036-2396
Telephone 202.416.6800
Fax 202.416.6899

NEW YORK
LOS ANGELES
BOSTON
BOCA RATON
NEWARK
NEW ORLEANS
PARIS

Joseph E. Casson
Partner

Direct Dial 202.778.1111
jcasson@proskauer.com

October 19, 2005

Catherine A. Stanton
Recorder
Armed Services Board of Contract Appeals
Skyline Six, Room 703
5109 Leesburg Pike
Falls Church, Virginia 22041-3208

Re: ASBCA No. 54930
Appeal of General Injectables & Vaccines, Inc.
Under Contract No. SP-0200-04-D-0003
Reply to Appellee's Response to Motion for Summary Judgment

Dear Ms. Stanton:

Pursuant to the order of the Board, GIV hereby submits its Response to the Government's September 13, 2005 Reply to Appellant's Response to Motion for Summary Judgment ("Reply").

## INTRODUCTION

The Government's Reply addresses two points:

1. That the contract required GIV to obtain flu vaccine meeting the salient characteristics listed on page 23 of the Solicitation and then deliver that vaccine to the Government in accordance with the contract's delivery schedule, and:
2. That the failure to deliver was GIV's fault and was not excusable.

For the reasons set forth below, both of these positions are wrong.

## ARGUMENT

I. GIV had no obligation to perform under the Contract because the express conditions precedent to its performance never occurred

A. Contrary to the allegations in the Reply, the Contract terms expressly conditioned GIV's agreement to deliver Fluvirin® on release of the vaccine by the FDA, as well as release of the vaccine by its manufacturer

The Government's own Reply attaches Contract provisions that include language conditioning GIV's delivery obligation on FDA release of the vaccine. Despite this, the Government argues that it was GIV's obligation to obtain FDA approval, an argument we address in Section I.B, below. Government Reply at 2. The Reply ignores the critical fact that GIV conditioned its obligations under the Contract not only on the FDA's inspection and release of the vaccine, but also on Chiron's release of the vaccine for export to the United States. For example, on April 15, 2003, in response to Amendments #3 and #4 to the Solicitation requested by the Government, GIV specifically notified the DoD "that GIV proposes the following delivery schedule *contingent upon release of product from the manufacturer*" (emphasis added). R4, Tab 7.

For the Government to represent in its pleadings that there was any unconditional delivery schedule set out in the Contract, such that an inability to deliver within that schedule would warrant a punitive termination action against GIV is a complete mischaracterization of the facts. *See* Government Reply at 2. The Contract includes no less than seven (7) distinct clauses conditioning delivery by GIV on release of Fluvirin® by either the FDA or Chiron, or on the

availability of Fluvirin®[1]. In addition, the parties' course of conduct between the time the Contract was awarded to GIV and the date on which GIV notified the Government that it would be unable to deliver Fluvirin® unequivocally demonstrate that there was no "agreed upon delivery date" in the Contract.

The Rule 4 documents submitted to this Board by the Government include copies of email correspondence between the Contracting Officer and GIV. These emails show conclusively that the Government knew and accepted that GIV had no control over the delivery schedule of the flu vaccine manufactured by Chiron, and that any delivery schedule, if there was to be delivery at all, was totally dependent on the FDA and Chiron and completely beyond the control of GIV. For example:

- R4, Tab 10, internal Government email dated 7/7/04: "I spoke with Mr. James 'Tinker' Short at GIV yesterday afternoon. He said that last week Mr. Helsby (Supplies Manager from Chiron Vaccines) visited GIV. ..... GIV anticipates receiving a delivery schedule from Chiron the end of this week. The first shipment (quantity not yet certain) is anticipated in August. Mr. Short told me that by the end of next week he would be able to give me a better idea of when and how much GIV would ship DSCP in the coming

1 "May have to alter delivery schedule outlined in bid due to releases of vaccine" (R4, Tab 1, page 4 of 50); "Delivery: Dependent upon FDA release of vaccine, 50% of each awarded CLIN quantity shall be delivered during the month of September ...." (R4, Tab 4, page 2 of 7); "Delivery: Dependent upon FDA release of vaccine, 50% of each awarded CLIN quantity shall be delivered during the month of September ...." (R4, Tab 4, page 8 of 50); "Delivery: Dependent upon FDA release of vaccine, delivery will be as follows:" (R4, Tab 6, page 4); "Attached you will find Amendments #3 and #4 to the above referenced solicitation. Please note that GIV proposes the following delivery schedule contingent upon release of product from the manufacturer." (R4, Tab 7); "Delivery by: Dependent upon FDA release of vaccine, delivery will be as follows:" (R4, Tab 8, page 2 of 3); "CLIN 0001AA and 0003AA DELIVERY BY: Dependent upon FDA release of vaccine, delivery will be as follows:" (R4, Tab 9, page 5 of 5) (F#4).

months. ...." This hardly sounds like an "unconditional" delivery schedule. Indeed, it reflects the Government's clear understanding that both the timing and quantity of deliveries were subject to Chiron's control and not GIV's.

Based on the record before this Board, it is clear that the Contract conditioned GIV's obligation to deliver Chiron's flu vaccine to the Government on release of that vaccine by the FDA and Chiron. Further, the record is clear that the Government understood that the contract was so conditioned, that GIV had no control over the delivery schedule, and that the schedule for delivery of the vaccine was fluid, depending on when or if the vaccine was released by Chiron and the FDA. For these reasons, the Government's termination of the Contract due to GIV's failure to "deliver Fluvirin® flu vaccine by the dates specified in [the] Contract" (R4, Tab 14 at page 1) cannot stand.

Finally, the Government is correct that it "did not agree to pay Appellant more than $16 million dollars to merely deliver the vaccine." In fact, it agreed to pay some or all of that amount to GIV in exchange for GIV acquiring and delivering the vaccine, *provided* the product was delivered by the manufacturer and released by the FDA. Neither event occurred and the Government was not obligated to pay GIV anything, just as the contract contemplated.

B. <u>Contrary to the allegations in the Reply, GIV had no liability if the FDA failed to approve or release Fluvirin for export and sale into the United States</u>

A second Government theory is that GIV had the contractual obligation to "first obtain" the branded Fluvirin® from England, and then "offer it for inspection" to the United States Food and Drug Administration "on or before the agreed upon delivery dates to ensure timely delivery" in order to avail itself of the excusable delay defense. Government's Reply at 2. This argument

is absurd. The importation of a drug into the United States prior to its approval by the FDA is a crime. The Government's argument would place GIV in the position of having to take a course of action that is entirely illegal under United States law in order to comply with the terms of the Contract as interpreted by DoD. The Contract cannot be read to require GIV to break the law in order to avoid a termination for cause by the Government. Furthermore, it is well known by the Government that inspection of a foreign manufacturing facility seeking to export drugs to the United States is an inherent part of the FDA regulation of pharmaceutical manufacturing. To suggest that GIV should have circumvented that process by importing an unapproved drug defies logic.

GIV made clear in its response to the Solicitation that it was not the manufacturer of Fluvirin® (R4, Tab 1, pages 15-16; Complaint ¶5), and that it had no control over the manufacturer or the manufacturing process of Fluvirin® (R4, Tab 1, pages 15-16; Complaint ¶5). GIV also made clear that its role related to Fluvirin® was limited to the delivery of the product to purchasers. *See, e.g.*, Contract Addendum, Past Performance, "GIV has had numerous years of experience in *distributing* flu vaccine to governmental agencies as well as commercial customers. Last year, GIV was contracted with the following governmental agencies *for the distribution of Fluvirin*" (emphases added) (R4, Tab 1, last page).

The Government's argument ignores the fact that the product at issue -- Fluvirin® -- was manufactured in a foreign country. Notwithstanding the Government's proffer in its Reply, it simply was not logistically, or indeed *legally*, possible for GIV to do what the Government alleges it was obligated to do under the Contract. As the United States distributor of a product

manufactured overseas, GIV could not "obtain" Fluvirin® and "offer" the flu vaccine to the US FDA for inspection. Under the FDA regulatory scheme, only the manufacturer of a product can "offer" a product for FDA inspection and approval for US importation. *See* 21 C.F.R. §§ 26.1 *et seq*. Unless a product has first been approved for importation into the United States by the FDA, a distributor can never lawfully possess that product. In the case of Fluvirin® for last year's flu season, that never occurred. Once the FDA prohibited importation of Fluvirin® there was no way for GIV to obtain the product. Because GIV was not the manufacturer of Fluvirin®, GIV could not, and therefore, did not, obligate itself to perform any actions over which it had no control or for which it had no legal authority. Because GIV was not the manufacturer of Fluvirin®, GIV expressly disclaimed liability for any manufacture or importation issues related to the vaccine. *See* GIV's August 11, 2005 Response at pages 10-11 for the seven (7) conditions precedent to GIV's obligation to deliver.

The Government's further allegation that the Contract's Inspection and Acceptance Clause obligated GIV to obtain FDA approval of flu vaccine is equally flawed. By the express terms and provisions of the Contract, any government inspection and/or acceptance of "end items" *for purposes of GIV's compliance with the Contract terms* was to occur at the product "destination" (R4, Tab 1, pages 8, 13). Had the Government exercised its "right to require inspection and acceptance at contractor's plant," the Contract is clear that – consistent with a pure delivery Contract – the "plant" where inspection and acceptance was to take place was GIV's facility in Bastian, Virginia, where any Fluvirin® which had been shipped by Chiron and released by the FDA was to have been "packed and prepared for shipment." (R4, Tab 1, pages

13, 16). In sum, there simply are no provisions of the Contract that could even remotely be construed to impose the obligations on GIV that the Government's Reply seeks to impose.

II. Contrary to the allegations in the Reply, GIV has proven that its inability to deliver Fluvirin® was excusable

GIV has pled sufficient facts to satisfy its burden of proving excusable default. Through the Complaint and the Government's admissions in its Answer, GIV has proven that its inability to deliver flu vaccine under the Contract was not due to any fault or negligence on the part of GIV. There are no allegations whatsoever by the Government of any wrongdoing on the part of GIV, other than a bald accusation that GIV failed to deliver flu vaccine in accordance with terms set out in the Contract.

The Government's contention that GIV failed to meet its burden with respect to the negligence of Chiron completely misses the point. As set forth in the regulations, GIV has proven that its inability to deliver flu vaccine under the Contract was not due to any fault or negligence on the part of any subcontractor to GIV. In fact, GIV's performance under the Contract did not rely on the use of any subcontractors. Chiron certainly was not GIV's subcontractor under the Contract. GIV made clear to the Government when it submitted its response to the Solicitation that it did not intend to perform its obligations under the Contractor through subcontractors, and the Government accepted GIV's response to the Solicitation without requiring GIV to submit a Small Business Subcontracting Plan. Complaint ¶6, ¶72, ¶73; Answer ¶6, ¶72, ¶73. GIV's request for a waiver from the requirement to submit a Small Business Subcontracting Plan stated, in relevant parts:

As we discussed, you have the authority to waive the submission of an SBSP by an offeror of a solicitation in those circumstances where there is little or no practicable opportunity for the offeror to utilize the services of a subcontractor in order to perform its obligations under the solicitation. Please be advised that due to the nature of the above specific Solicitation (seasonal flu vaccine), as well as the fact that GIV functions as an importer and licensed wholesale distributor of the flu vaccine that is the subject of the Solicitation, rather than the holder of the NDA for the subject vaccine, that there are no practicable opportunities to subcontract any of the services to be performed under this Solicitation, with the possible exception of trucking services to deliver the product to governmental agencies pursuant to federal purchase orders.

As GIV reported in ....the Solicitation, GIV does not manufacture the flu vaccine itself. The product that is being purchased under this Solicitation is produced in the United Kingdom by [Chiron] Vaccines..... GIV is the importer and exclusive licensed wholesale distributor of the vaccine from and on behalf of the UK manufacturer. Because GIV imports and distributes the product, the VA considers GIV to be the "manufacturer" for purposes of responding to this Solicitation.

You and I discussed several aspects of this particular Solicitation that make subcontracting by GIV impracticable. First is the seasonable nature of the availability and need for the product. As you are aware, this product cannot be warehoused, and therefore must be processed quickly upon its importation by GIV before it is shipped out to the ultimate purchaser.

This need for rapid processing is the second reason why it is not practicable, efficient or reasonable to subcontract out any of the services called for in the Solicitation. At this time, GIV performs all these services inhouse and does not subcontract any part of this process, with the possible exception of cross-country trucking/transportation services.

The Government may not now try to hold GIV responsible for acts of an entity ( whether or not that entity was negligent) where it was not a subcontractor to any obligations undertaken by GIV under its contract. For the Government to take the position that a manufacturer of a product is the subcontractor of the wholesaler of that product is to turn the entire process on its head. Thus, the critical element is not whether Chiron was negligent, but rather whether Chiron was a subcontractor to GIV. Clearly, it was not.

Finally, the Government misses the point with respect to the burden of proof of excusable default. The Government filed a Motion for Summary Judgment in which it asked this Board to hold GIV liable for $2,300,000.00 in excess procurement costs because of unexcusable default. A summary judgment motion is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. The burden is on the movant to establish the absence of any genuine issues of material fact. *Mingus Constructors, Inc., v. United States*, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); *Arnold V. Hedberg*, ASBCA No. 31747, 90-1 BCA par. 22,577 at 113,313-14. Furthermore, all reasonable inferences must be construed in favor of the party opposing the motion. *Kasel Manufacturing Co.* ASBCA No. 26975, 86-1 BCA par. 18,697. As the Government was the moving party in its Motion for Summary Judgment, the burden of proof was squarely on the Government. GIV met its burden of proving its entitlement to the defense of excusable default, and its defense that clear conditions precedent to its contractual obligations were never met. The Government failed to meet its burden of proving GIV's liability in its Motion for Summary Judgment.

## III. Conclusion

For these reasons, GIV was not in default of the Contract, or alternatively the default was legally excusable. The Government's Motion for Summary Judgment must be denied. GIV respectfully requests the following relief:

1. a reversal of the Final Decision of the DoD terminating the Contract for Cause;

2. a conversion of the Termination For Cause to a Termination for the Convenience of the Government;

PROSKAUER ROSE LLP



3. a denial of the DoD's claim for excess procurement costs; and

4. an Order awarding GIV its costs of suit, and such other and further relief as the Board finds is just and proper, including such relief as may be afforded by the Equal Access to Justice Act 5 U.S.C. § 504, as amended.

Sincerely,

Joseph E. Casson

cc: Kathleen D. Hallam
Chief Trial Attorney
Defense Supply Center Philadelphia
700 Robbins Avenue, Bldg. 36/1
Philadelphia, PA 91111-5092