**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | |
|---|---|
| GENERAL INJECTABLES & VACCINES, INC.,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 07-156C<br>(Judge Williams)<br><br>Filed Electronically on August 20, 2008 |

**PLAINTIFF'S PROPOSED FINDINGS OF UNCONTROVERTED FACTS**

Pursuant to Rule 56(h)(1) of the Rules of Court of Federal Claims, Plaintiff General Injectables & Vaccines, Inc. ("GIV") submits the following proposed findings of uncontroverted facts:

1. The Defense Supply Center Philadelphia ("DSCP") is a field activity of the Defense Logistics Agency, which is a subagency within the Untied States Department of Defense. (ASBCA Compl. ¶ 2, App. 131; ASBCA Answer ¶ 2, App. 155.)[1]

2. GIV is a wholesale distributor of pharmaceuticals and supplies. (Compl. ¶ 1; Answer ¶ 1.)

3. On January 14, 2004, DSCP issued Solicitation No. SPO 200-04-R-0005 seeking bids for the delivery of injectable flu virus vaccine. (Compl. ¶ 4; Answer ¶ 4.)

[1] References to "App." are to the appendix filed by GIV in General Injectables & Vaccines, Inc. v. Gates, No. 2007-1119 (Fed. Cir.), a copy of which is included in the appendix to the Memorandum of Law in Support of Plaintiff's Motion for Judgment on the Pleadings or, Alternatively, for Summary Judgment. References to "ASBCA" pleadings are to those filed in Armed Services Board of Contract Appeals docket number 54930, many of which are reproduced in the Federal Circuit appendix.

4. Solicitation No. SPO 200-04-R-0005 contained three contract line item numbers ("CLINs"), all three of which stated that the vaccine had to be "suitable for subcutaneous or intramuscular administration." (Compl., Ex. 1 at 23, 25, 27.)

5. GIV offered to meet the solicitation's requirements by supplying Fluvirin, which is an injectable flu virus vaccine manufactured by Chiron Vaccines ("Chiron"). (Compl. ¶ 5; Answer ¶ 5.)

6. On April 21, 2004, DSCP awarded GIV Contract No. SPO 200-04-D-0003 (the "Fluvirin Contract") for an indefinite quantity of injectable flu vaccine. (Compl. ¶ 7; Answer ¶ 7.)

7. The Fluvirin Contract contained two CLINs, the first of which called for an annual estimated quantity of 226,846 10-dose vials of injectable flu vaccine suitable for immunizing persons four years of age and older at a price of $64.60 per 10-dose vial. (Compl., Ex. 1 at 96.)

8. The second CLIN called for packages of 10 single-dose, prefilled syringe units containing injectable flu vaccine suitable for immunizing persons four years of age and older at a per package price of $86.00. (*Id.*)

9. Based on these annual estimated quantities, the Fluvirin Contract called for $16,155,811.60 in injectable flu vaccine. (*Id.*)

10. Also on April 21, 2004, DSCP issued a delivery order for 226,846 vials of vaccine and 17,460 packages of prefilled syringe units. (Compl. ¶ 8; Answer ¶ 8.)

11. On or about August 25, 2004, Chiron notified the United States Food and Drug Administration ("FDA") that Chiron had discovered bacterial contamination in eight lots of final vaccine produced for the 2004-2005 flu season. (Compl. ¶ 9; Answer ¶ 9.)

12. Chiron also notified the FDA on that date that Chiron could not release any flu vaccine for importation to the United States until both British and United States authorities affirmatively deemed its product safe and saleable. (ASBCA Compl. ¶ 9; ASBCA Answer ¶ 9.)

13. In spite of the August contamination report, on September 28, 2004, Chiron's chief executive officer appeared before a committee of the United States Senate and testified that Chiron expected to release between 46 million and 48 million doses of Fluvirin to the United States beginning in early October 2004. (Compl. ¶ 10; Answer ¶ 10.)

14. Between September 28 and 30, 2004, the Medicines and Healthcare Products Regulatory Agency ("MHRA"), England's counterpart to the FDA, conducted an inspection of Chiron's Liverpool manufacturing facility, and, on October 5, 2004, MHRA suspended Chiron's license to operate for three months. (Compl. ¶ 11; Answer ¶ 11.)

15. On October 7, 2004, DSCP purchased 25,000 packages of FluMist from GIV at a per 10-dose package price of $104.79. (Compl. ¶ 12; Answer ¶ 12; Puckett Decl., Ex. 1.)[2]

16. In its purchase order, DSCP specified that it was purchasing "INFLUENZA VIRUS VACCINE, LIVE, ATTENUATED, NASAL SPRAY, TRIVALENT, 0.5 MK DOSE, PREFILLED SINGLE USE SPRAYER." (Puckett Decl., Ex. 1.)

17. DSCP did not assert in its purchase order that GIV had "defaulted" under the Fluvirin Contract, nor did it tell GIV that it was purchasing the FluMist as a replacement for Fluvirin. (Compl. ¶ 13; Answer ¶ 13; Puckett Decl., Ex. 1.)

18. At the time of the 2004-2005 flu season, FluMist was an extremely new product that had been on the market for approximately one year. (Puckett Decl. ¶ 7.)

[2] References to "Puckett Decl." are to the August 20, 2008 Declaration of Tracy B. Puckett, Manager for Corporate Accounts, General Injectables & Vaccines, Inc., a copy of which is attached.

19. Unlike Fluvirin, FluMist required special handling procedures because it had to be stored and shipped in a frost-free frozen state. (Puckett Decl. ¶ 8.)

20. Generally speaking, injectable flu vaccine must be transported at two to eight degrees Celsius, which temperature can be maintained by refrigerated shipping. (*Id.*)

21. During the 2004-2005 flu season, however, FluMist had to be shipped frozen. (*Id.*)

22. GIV would process orders for FluMist and have the vaccine shipped directly from the manufacturer to the customer. (*Id.*)

23. The manufacturer shipped FluMist to the customer, packing it with dry ice to keep the product frozen. (*Id.*)

24. The processing of FluMist orders was much more complicated than orders for Fluvirin. (Puckett Decl. ¶ 9.)

25. For example, prior to the customer receiving a shipment of FluMist, GIV had to make sure that the customer also received specially designed freeze boxes to store the product and to make sure that the customer clearly understood what type of freezer and the amount of freezer space would be required for storing FluMist. (*Id.*)

26. GIV then had to notify the customer prior to the arrival date of the shipment to ensure that the freeze box had been conditioned by being frozen at least four days prior to the arrival of the FluMist. (*Id.*)

27. FluMist, which is more expensive that Fluvirin, is not an injectable vaccine; rather it is inhaled through the nose. (Compl. ¶ 12; Answer ¶ 12.)

28. FluMist is a live vaccine that during the 2004-2005 flu season, was not suitable for all persons four years of age and older. (Compl. ¶ 12; Answer ¶ 12.) Instead, the product was FDA-approved for use by only healthy persons aged five to forty-nine. (Puckett Decl. ¶ 11.)

29. By letter dated October 12, 2004, GIV's parent company notified DSCP that GIV would be unable to deliver Fluvirin because of Chiron's inability to supply the vaccine. (Compl. ¶ 14; Compl., Ex. 2; Answer ¶ 14.) In that letter, GIV explained that it was "doing everything possible to identify potential alternative sources of flu vaccine." (Compl., Ex. 2.)

30. On October 15, 2004, following the FDA's inspection of Chiron's Liverpool facility, the FDA embargoed the importation of Fluvirin into the United States. (Compl. ¶ 15; Answer ¶ 15.)

31. Also on October 15, 2004, the FDA declared that none of the Fluvirin already in the United States could be distributed. (Compl. ¶ 15; Answer ¶ 15.)

32. Aventis, which made an injectable flu virus vaccine known as Fluzone, did not have enough time to manufacture enough extra Fluzone to cover the shortage created by the Chiron situation. (Compl. ¶ 15; Answer ¶ 15.)

33. On November 1, 2004, the DSCP Contracting Officer completed a three-page "DETERMINATIONS AND FINDINGS" ("D&F"). (App. 113-15.) Among other things, the DSCP Contracting Officer described how on October 7, 2004, DSCP had ordered 25,000 packages of FluMist from GIV. (D&F ¶ 9, App. 114-15.) The Contracting Officer's D&F stated that on October 21, 2004, DSCP had ordered 50,000 vials of injectable Fluzone from Aventis at a price of $63.31 per 10-dose vial, which was $1.29 cheaper that the per-vial price under the Fluvirin Contract. (*Id.*) The D&F also stated that the Government intended to terminate the Fluvirin Contract for cause (D&F ¶ 7, App. 114), and "[i]n accordance with FAR 12.403(c)(2), the

Government intend[ed] to assert its right to acquire similar items in another contracting action and to charge GIV with any excess reprocurement costs together with any incidental or consequential damages incurred because of the termination" (D&F ¶ 8, App. 114).

34. On November 15, 2004, the Contracting Officer issued a final decision terminating the Fluvirin Contract for cause, asserting that GIV had failed to make timely delivery and that the failure to deliver was not excusable. (Compl. ¶ 20; Compl., Ex. 3; Answer ¶¶ 20, 65.) The November 15, 2004 decision did not assess excess reprocurement costs against GIV in connection with DSCP's October 7, 2004 purchase of FluMist, stating only: "The [G]overnment reserves all rights and remedies provided by law and as provided by the contract. In accordance with FAR 12.403(c)(2), the Government intends to assert its right to acquire similar items in another contracting action and to charge GIV with any excess reprocurement costs together with any incidental or consequential damages incurred because of the termination." (Compl., Ex. 3 at 2.)

35. DSCP made additional purchases of FluMist from GIV throughout the remainder of 2004 and early 2005, eventually ordering 33,795 additional packages of FluMist for a total of 58,795 packages. (Answer ¶ 66.) The total cost of the FluMist DSCP purchased was $9,994,683.55 less than what would have been the purchase price under the Fluvirin Contract.

36. No later than June 13, 2005, GIV received payment for the last of DSCP's FluMist purchases for the 2004-2005 flu season. (Puckett Decl. ¶ 12.)

37. Meanwhile, on March 14, 2005, GIV appealed the Contracting Officer's termination of the Fluvirin Contract for cause to the Armed Services Board of Contract Appeals (the "Board"). (ASBCA Compl., App. 130-154.)

38. In so doing, GIV also challenged DSCP's ability to demand excess reprocurement costs stemming from the agency's purchases of FluMist. (ASBCA Compl. ¶¶ 79-96, App. 149-53.)

39. GIV explained to the Board that, in a telephone conference on February 10, 2005, DSCP had informed GIV that it would seek approximately $2,300,000 in excess reprocurement costs, which DSCP alleged represented the difference in cost between the Fluvirin and the FluMist DSCP had ordered from GIV. (ASBCA Compl. ¶ 29, App. 138.)

40. In response, DSCP admitted that "during a February 10, 2005 telecon [sic] DSCP advised [GIV] that the delta between the cost of Fluviron [sic] ordered under the Contract and FluMist was approximately $2,300,000." (ASBCA Answer ¶ 29, App. 159.)

41. DSCP nonetheless argued that the Board lacked jurisdiction to consider the excess-reprocurement-cost issue because DSCP had not issued a formal, written demand for such costs. (Compl. ¶ 22; Answer ¶ 22.) On July 8, 2005—25 days after GIV had received final payment for the last of DSCP's FluMist purchases—DSCP filed a motion for summary judgment in the Board proceeding. (ASBCA DSCP Mot. for Summ. J., App. 168-79.) In arguing that the Board lacked jurisdiction to decide GIV's challenge to DSCP's ability to demand excess reprocurement costs, DSCP asserted that "there is no Government claim [for excess reprocurement costs] to challenge, as the Government has not yet issued any demand for excess reprocurement costs." (ASBCA DSCP Mot. for Summ. J. at 11, App. 178.)

42. In response, GIV argued that there was no reason for DSCP to withhold issuance of a formal demand for excess reprocurement costs, explaining:

> This case does not present a situation where the Government cannot yet quantify the amount of its alleged damages, or a situation where the Government is still in the process of rebidding a contract. DoD "reprocured" FluMist® in October 2004, quantified the "delta" between the cost of Fluvirin® under the Contract and

> the cost of FluMist® it purchased prior to its termination of GIV's Contract, and notified GIV of its claim for reprocurement costs in February [2005].

(ASBCA GIV Cross-Mot. for Summ. J. at 18, App. 199.)

43. On September 13, 2005—more than three months after GIV received final payment for the last of DSCP's FluMist purchases—DSCP again represented to the Board that DSCP's claim for excess reprocurement costs had "not matured yet" and that "no Government demand for costs has been issued." (ASBCA DSCP Reply in Supp. of Mot. for Summ. J. at 4, App. 207.)

44. In a written decision issued on August 31, 2006, the Board upheld the Contracting Officer's decision terminating the Fluvirin Contract for default. *See General Injectables & Vaccines, Inc.*, ASBCA No. 54930, 2006 WL 2589950. In addition, the Board agreed with DSCP's ripeness argument, concluding that it would not consider the "propriety of government reprocurement actions" in the absence of a formal, written demand. *Id.* at *11.

45. At the earliest, GIV had until December 29, 2006, to appeal the Board's decision to the United States Court of Appeals for the Federal Circuit. *See* 41 U.S.C. § 607(g)(1)(A) (providing that contractor may appeal Board's decision to the Federal Circuit within 120 days "after the date of receipt of a copy of such decision").

46. Shortly before GIV was set to file its notice of appeal, it received a letter from DSCP dated December 11, 2006, in which DSCP demanded $2,362,971.05 in excess reprocurement costs from GIV. (Compl. ¶ 23; Compl., Ex. 6; Answer ¶ 23.) According to DSCP's letter:

> The Government ultimately substituted FluMist® to compensate for the undelivered doses [of Fluvirin]. The amount shown above represents the price difference between the FluMist® package (10 doses) and GIV's vial (10 doses) price. The Government purchased in total 58,795 packages of FluMist® to fill the shortage created by GIV's inability to deliver.

(Compl., Ex. 6 at 1.)

47. After filing its notice of appeal in the Federal Circuit, GIV initiated the instant action on March 9, 2007, in order to challenge DSCP's December 11, 2006 demand for excess reprocurement costs pursuant to 41 U.S.C. § 609(a)(1). Among other things, GIV asked for an order declaring that Defendant was not entitled to excess reprocurement costs. (Compl. at 11.)

48. On July 7, 2007, Defendant filed its Answer and Counterclaim to GIV's Complaint in this case. In it, Defendant admitted that DSCP's demand for $2,362,971.05 in excess reprocurement costs had been overstated because DSCP had failed to take into account the fact that DSCP had voluntarily relinquished its right to 20,000 vials of Fluzone and that 50,000 vials of Fluzone it claimed to have acquired from Aventis was slightly cheaper than the Fluvirin it had contracted to purchase from GIV. (Answer ¶¶ 70-73.) In all, Defendant reduced its demand for excess reprocurement costs by $868,300, to $1,494,671.05. (Answer ¶ 75.) After GIV answered Defendant's counterclaim, this Court stayed the instant case on September 14, 2007, pending the outcome of GIV's Federal Circuit appeal.

49. On March 19, 2008, a three-judge panel of the Federal Circuit upheld the Board's decision affirming the Fluvirin Contract's termination for cause. *See General Injectables & Vaccines, Inc. v. Gates*, 519 F.3d 1360 (Fed. Cir. 2008). On June 3, 2008, the Federal Circuit issued a supplemental opinion denying GIV's combined petition for panel rehearing and rehearing en banc. *See General Injectables & Vaccines, Inc. v. Gates*, 527 F.3d 1375 (Fed. Cir. 2008). This Court reactivated the instant case shortly thereafter.

* * * * *

Dated: August 20, 2008

Respectfully submitted,

s/Bruce E. Fader by s/James F. Segroves
Bruce E. Fader
PROSKAUER ROSE LLP
1585 Broadway
New York, NY 10036
212.969.3000
212.969.2900 (fax)
bfader@proskauer.com

*Counsel of Record for Plaintiff*
*General Injectables & Vaccines, Inc.*

*Of Counsel*:
James F. Segroves
PROSKAUER ROSE LLP
1001 Pennsylvania Avenue, NW
Suite 400 South
Washington, DC 20004-2533
202.416.6871
202.416.6899 (fax)
jsegroves@proskauer.com